Statement of the Case.
NICHOLLS, C. J.
The district court rendered judgment in this case in favor of. the defendants decreeing “that the amendment to the Constitution to the state of Louisiana of 1898 -shown and set out by the joint resolution of the General Assembly of the state of Louisiana approved August 18, 1899, ‘proposing an amendment to the Constitution of the state of Louisiana relative to ratifying and carrying into effect a special tax levied in the city of New Orleans for certain public improvements, and to establish therein a public system of sewerage and water, the issuance of bonds therefor, and the providing ways and means to pay the principal and interest of said bonds,’ fully set out in Act No. 4, p. 6, of the Extra Session of the Legislature of 1899, be, and is hereby, decreed to have been passed and adopted by the said General Assembly in full conformity with the provisions of the Constitution of the state of Louisiana, and particularly article 321 thereof, and especially that the same, in the sense of said Constitution and of said article 321, was read in each one of the respective houses of the said General Assembly on three separate days, and that the said amendment was, together with the yeas and nays thereon, entered on the journals of each house as required by said Constitution, and two-thirds of the members elected to each house concur *316 red therein, and that all of the conditions, requisites and limitations of the state Constitution of the state of Louisiana, and particularly of the said article 321 thereof, were conformed to and complied with by the said General Assembly in the exercise as aforesaid of its power of revision or amendment of the said Constitution with regard to the existing Constitution of Louisiana; that the Constitutional amendment evidenced by said joint resolution be declared to be part and parcel of the present existing Constitution of the state of Louisiana, and to have effect as all other parts thereof. It is further ordered and decreed that plaintiff’s demand be rejected, at his costs.”
It assigned the following as its reasons for judgment:
“On June 6, 1899, the property tax payers of New Orleans voted a special tax for public improvements, and said tax was levied by Ordinance No. 15,391, of June 22, 1899, the special object being a public system of sewerage and water; and to this end to issue bonds based on said special tax, and to provide the ways and means to pay the same in capital and interest. To place said bonds, said tax levy, and said system generally beyond all question, the General Assembly, in Act No. 4, approved August 18, 1899, proposed to the people of the state an amendment to the Constitution of the state legalizing and ratifying said special tax and said city ordinance, and authorizing the issue of the bonds for said public sewerage and water system, etc.
“The amendment thus proposed was published as required by law, and at the ensuing election was ratified by the people of the state by a large majority of the votes cast at said election. On the faith of this organic change ratifying the special tax voted by the property holders of New Orleans and the ordinance of the council levying said tax, the sewerage and water board was organized, and through it and the city council and the board of liquidation co-operating in due form of law as provided in said various public acts of the people of the city and .of 'the state, bonds were prepared to the amount of $12,-000,000, and placed on the market of the world, and sold, and are now outstanding to a large amount, and the special tax, also, to a large amount has been collected year by year since said plan was adopted. A general system of improvement in the way of sewerage and water, etc., has been devised, and in aid thereof contracts have been made, property and rights of great value and at heavy outlay of said funds have been acquired, and all things in the way of carrying on said proposed works of public sewerage and improvement have been far advanced, and are now, it is believed, on the way towards successful completion.
“During all the stages of this work from the time of the ordinance authorizing the special election of the property tax payers, the ordinance levying the tax, the call for the special session of the General Assembly, its session, its action submitting said amendment to the Constitution, the subsequent publication thereof by the Secretary of State, the election by the people, their vote ratifying said amendment, and the proclamation of the result, the organization of said sewerage and water board, its acts and those of the board of liquidation in regard to plans, contracts, and general operation, the issue of bonds and placing them on the market of the world, and during the several years in which the people have regularly paid the special tax, basing all these operations, no word of complaint and no objection has been made by any public authority or by any individual taxpayer. Now for the first time in this suit, filed February, 1903, objection is made by a taxpayer that the special tax cannot be collected, that the issued bonds are worthless, and all that has been done in proposing to the people said amendment to the Constitution failed to comply with some of the directions of the Constitution in regard to constitutional amendments.
“The special ground is that article 321 of the Constitution directs that amendments proposed must be read in the respective houses on three separate days, and that this means that said amendment must be read in full, whereas in fact said amendment was read only once in full in each house, and on the other two days in each house was only by its title, and not in full. It is urged that the title forms no part of the amendment, and that reading the amendment by its title was not the reading of the amendment itself. The journals of the two houses show that it was read in each once in full, and *318 on two other separate days that it was read by its title; that it was entered in full on the journals; and that on the aye and nay vote it received the approval of more than two-thirds of all the members of both houses of the General Assembly. Its subsequent publication by the Secretary of State, and its adoption by the people at the subsequent election, and the compilation of the returns and the promulgation of the results of the election, etc., are conceded. The only question submitted is as to the reading of said amendment on three separate days in each house, as required by article 321 of the Constitution. We are to inquire at the outset what is meant by the words of said article, ‘after such proposed amendments have been read in such respective houses on three separate days.’ ‘Have been read,’ and not ‘have been read in full’ is the plain language of the article.
“What the meaning of this legislative reading is, I think, can be gathered from the text of the Constitution itself as contained in articles -39 and 321, and from a review of the similar articles found in our preceding Constitution, and the changes appearing in them successively.
“The Constitutions of 1812, 1845, and 1852 all required that a bill should be ‘read over’ on three several days; that is, read in full. The Constitution of 1868 omitted the word ‘over,’ and provided that a bill should be ‘read.’ In 1879 the convention, remembering well how bills had been passed under the Constitution of 1868, provided for readings, but only for one reading in full. So, also, the Constitution of 1898, art. 39, provides that every bill shall be read on three different days in each house, and no bill shall be considered for final passage unless it has been read once in full, etc.
“It seems evident, then, that when the Constitution prescribes legislative readings it means the ordinary parliamentary reading by title, or in such other manner as the particular house shall direct, unless it prescribes that the proposed measure or bill shall be ‘read in full.’
“The foregoing suggestions appear in the headlines of the argument of the late Thomas J. Semmes in the case in 43 La. Ann. 591, and the conclusion reached as to the rule of interpretation seems to me correct, and that it may be safely applied whenever any issue arises as to any legislative reading of any bill or of any proposed measure by any Legislature sitting under our Constitution of 1898.
“Article 321 provides that the proposition for the amendment of this Constitution may be made by the General Assembly at any session thereof, and, if two-thirds of all the members elected to each house shall concur therein after such proposed amendments have been read in such respective houses on three separate days, then they shall be entered, together with the yeas and nays thereon, on the journal, and then the Secretary of State shall publish them, and at the following election the people shall vote upon them, etc.
“This article does not require reading in full. It merely requires reading,' and, as above shown, this means such parliamentary reading as the particular house may direct. In other words, the reading, however it may be done, is a stage in the progression of the measure to the final action of the houses thereon; that the readings may be in full or otherwise, as the house may direct, and that mention of the fact of such reading entered on the journal in such manner as the house may approve fulfills the requirements of the Constitution. Whether the amendment has a title or not seems immaterial. If, as a fact, it has an introductory title, which identifies it so that there can be no uncertainty, it seems to me that it is competent for the house to direct it to be read by its title.
“Reading in full is not prescribed, and, as the Constitution requires the amendment to be copied in full on the journal with the yeas and nays of the members voting on its passage, I do not see why any parliamentary reading directed by the house acting on the measure is not sufficient. The object seems to be that on three separate days the house shall act on the measure, and the reading is required to attest the fact that in open session the attention of the members has been called to it for action. If the house so determine, I do not see wherein reading by the title or otherwise is ineffectual for the purpose of making the preliminary basis for entering the proposed amendment on the journal with the yeas and nays of the voting members thereon. It is to be entered on the journal in order that there may be no uncer *320 tainty as to the amendment proposed; and the recording of the yea and nay vote on its final passage is to attest the fact that the necessary two-thirds of all its members have voted for it.
“The whole purpose seems to be that there shall be no uncertainty as to the amendment proposed nor as to the required proportion of the membership having voted for its submission to the people. If these two conditions be fulfilled by the two houses of the General Assembly I do not think that the method by which they have read it on three separate days in their action advancing it to its final passage is essential, provided said method substantially fulfills the condition that the parliamentary reading has been had on three separate days. The essentials are certainty as to the amendment itself, certainty as to the two-thirds yea and nay vote in its favor; and when these essentials are fulfilled, and the requisite publication is made by the Secretary of State, and the popular vote approves the amendment, then it becomes part of the organic law. All other matters of direction except these essentials seem to be matters of mere evidence, and not conditions sine qua non.
“To amend the Constitution, the General ' Assembly, who are the servants and representatives of the people, may by a two-thirds vote propose.
“When the proposition is duly published, and the people adopt the proposition, then the amendment is complete. These are the essentials, and all else is matter of form of direction or of evidence.
“In this conclusion I am supported by the jurisprudence of our own state.
“In State ex rel. Morris v. Secretary of State, 43 La. Ann. 590, 9 South. 776, the objections urged against the legislative action proposing the amendment then at issue were infinitely more serious than is the objection to the amendment now under consideration. The integrity of the legislative journals was there put at issue, and other serious objections were made; while in- the case now at bar no objection is made except that there was not a reading in full of the amendment on three separate days in each house, but only one full reading and two readings by title.
“I find upon examination of the opinions of the justices composing the majority of the court in that case full corroboration of the views which I have expressed.
“Chief Justice Bermudez used this language:
“ ‘It suffices to say that the record establishes prima facie, at least, without Stronger ■counter proof, that the proposed amendment was offered, read, spread on the journals, voted upon in both houses of the Legislature in point of time and manner * * * as the Constitution requires. * * *
“ ‘The proposed amendment is tendered by two-thirds of all the members-elect of both houses of the General Assembly, in whose judgment it is in suitable shape, and has passed after reasonably full observance of all constitutional and strict exigencies. * * i!‘
“ ‘If, by the terms of the Constitution the Legislature could, of its own motion, amend the organic law without consulting the people, surely a more rigid compliance with ’the prescribed forms would have been exacted; but, as the Constitution merely enables the General Assembly to propose amendments to the people, the question of irreproachable fulfillment loses its gravity, and substantial adherence must be held as satisfactory.’ 43 La. Ann. 678-679, 9 South. 807.
“Mr. Justice McEnery, in his concurring opinion, in referring to the Prohibitory Amendment Case, 24 Kan. 700, decided by Judge Brewer, now an associate justice of the Supreme Court of the United States (State v. Secretary of State, 43 La. Ann. 675, 9 South. 806), used this language: ‘The provisions for amending the Constitution of Kansas are identical with article 256 of our Constitution. * * * The proposed amendment to the Constitution of Kansas did not appear on the journal of either house of the Legislature of Kansas. It was held by the court that the failure to spread the amendment on the journals was not one of the-essentials to its validity. The court said: “The two important vital elements in any constitutional amendment are the attest of two-thirds of the Legislature and a majority of the popular vote. Beyond this other provisions are mere forms. These may not be disregarded, because by them certainty as to the essentials is secured. But they are not themselves the essentials. * * * To insure certainty and guard against mistake, the *322 journal evidence of the amendment and votes is prescribed; but this is mere matter of evidence, and not the substantial condition of constitutional change.” ’
“This is direct authority, and it is applicable, because article 256 of the 1879 Constitution is the same as article 321 of our present Constitution, and both are identical with the article of the Kansas Constitution.
“And, stronger than all, Justice' McEnery adds, on page 670, 43 La. Ann., page 804, 9 South.: ‘It is not required by article 256 of the Constitution that the amendment should be read in full in each house. It was read three times by title in accordance with that article.’ Here is express authority on the very issue of the instant case. I need not further examine decided cases. The reason and philosophy of those examined commend them as the proper exposition of the principle. If they had not been pronounced, 1 would decide, on the face of the article 321, that it was in the power of the General Assembly to have the proposed amendment here under review read in such manner as to the respective houses might seem proper, whether by title or in full, and this because said article does not require that a proposed amendment shall be read in full, and therefore leaves it to the respective houses to direct such parliamentary reading on three separate days, as they may approve. In this instance it abundantly appears from the journal that such reading of this amendment was had, and the General Assembly and the people have accepted and ratified it.
“It follows that said amendment was submitted to the people in strict legal form, and, as it was accepted by the people after due publication, it became, and now is, a part of the organic law of the state.
“I do not care to notice the estoppel suggested in argument, except to say that it would be complete even if there were doubt on the first proposition. It must be so. Vast sums have been collected in the form of taxes. Vast sums have been paid out in contracts and for wages, works, and property. Vast sums have been paid for the bonds that have been issued. All this has been done on the faith of said constitutional amendment. The plaintiff taxpayer has remained silent during the four years in which all this has been going on. If he had objection to make, he should have made it when the amendment was proposed. As he was silent then, good conscience requires that he must keep silent now. It is perfectly evident that this estoppel will forever silence all taxpayers, as well as the state and the city; for, if this plan and all that has been done by the acquiescence and formal consent of all were undone, how could there be ever restitutio ad integrum?
“While absolute shelter may be found in this estoppel for the people and for the bondholders, I prefer to rest my judgment against the plaintiff upon the ground that, in my opinion, the constitutional amendment was proposed by the General Assembly in due form of law, and that, as the people accepted and adopted it, it is now a part of the state Constitution. Judgment for the defendants.”
Plaintiff appealed.
Opinion.
In 1899 a petition in writing, signed by more than one-third of the property taxpayers of the city of New Orleans, was presented to the council of the said city, asking it to levy on ail the property of the city of New Orleans a special tax of two mills on the dollar for 43 years, the proceeds thereof to be devoted to certain public improvements. Acting upon this petition, the city council passed an ordinance ordering a special election to be held submitting to the property taxpayers of the city of New Orleans the subject-matter of the petition. The election so ordered took place on the 6th of June, 1899, after due notice. As appears by the official announcement and promulgation made and published by the Secretary of State on the 26th of June of that year, the election resulted in a consent to the proposed tax under the terms and conditions set forth in the property tax payers’ petition by 6,272 votes, 394 votes only being cast against the levy of the same; and to the appointment of seven commissioners by the mayor, with the consent of the council, by a vote of 3,850 votes as against 2,695.
On the 20th of June, 1899, the common council, by Ordinance No. 15,391, which was duly published, levied the two-mill tax so voted, devoting the same to the purposes asked in the petition of taxpayers, and pro *324 viding in detail for the carrying out of the work contemplated by means of the tax. The taxpayers, in their petition to the council, had prayed it to obtain certain specified legislative and constitutional authority in the premises as soon as possible after the tax was voted, and, should this legislative and constitutional authority be not obtained prior to January 1, 1901, that then the special tax should thereafter cease and determine, and the proceeds of the same for the years 1899 and 1900 should be paid over to the drainage commission, to be used for drainage purposes. From the 4th of July, 1899, to the 8d of August public notice was given by the mayor of the city of New Orleans through New Orleans newspapers that at the next meeting of the Legislature, general or special, an act would be introduced embodying the provisions of Ordinance No. 15,891, C. S., of the city of New Orleans, levying special tax of two mills for water, sewerage, and drainage, organizing the sewerage and water board, defining its rules and powers, and providing for the issue and sale of the public improvement bonds of the city of New Orleans. On the 10th of July, 1899, the Governor of the state issued his proclamation (duly published) calling a special session of the General Assembly at Baton Rouge on the 8th of August for specified purposes. The first and second purposes were:
First, to take such legislative -action as may be necessary relative to the special tax voted for on June 6, 1899, by the taxpayers of the city of New Orleans, and of the Ordinance No. 15,891, levying said tax, to the organization of the sewerage and water board of the city of New Orleans, and defining its duties and powers, and the issuance of the public improvement bonds of the city of New Orleans, with proper provisions for their payment, principal and interest.
' Second. To the framing and submission to the people of the state of Louisiana of a pertinent constitutional amendment relative to the said special tax, the said water and sewerage board, the said public improvement bonds, and the legislation adopted at the said special session relative to the said special matter.
The General Assembly convened at the ‘time fixed, and upon the first day the Governor sent to it a special message, in which he declared that he had called them in extraordinary session in response to a well-defined public sentiment throughout the state, and1 particularly in the city of New Orleans. He then designated the objects to be acted upon at the session, the same being those enumerated in his proclamation. Continuing, the Governor said: “On the 6th day of June of the present year the property tax payers of the city of New Orleans voted a special tax of two mills on the dollar for three years, the proceeds of which, added to the one-half of the surplus of the existing debt tax of one per cent., to be dedicated to the establishment of public systems of sewerage, waterworks, and drainage for the city of New Orleans.
“To make this tax at once available, and to complete, at as early a date as practicable, these important systems of public works and improvements, it is desirable and necessary to capitalize this tax by issuing bonds to be sold on the markets on the most favorable terms, and for not less than par.
“In order to accomplish this, special legislation, as well as an amendment to the Constitution will be necessary. And, believing that it is for the interest not only of New Orleans, but of the whole state, that legislative aid and encouragement should be extended to the good people of the city in their great and patriotic movement toward progress, prosperity, and health, I trust that such legislation will be speedily enacted as will afford every facility for the early completion of these enterprises, so important and necessary to the public welfare and advancement.
“This growing sentiment in behalf of public sanitation and internal improvements has found expression in the various towns, cities, and-districts throughout the state, and they likewise seek legislative action to carry into effect article 281 of the Constitution, whereby they may raise the funds necessary to secure these public improvements.”
On the same day a bill was introduced into the Senate containing 37 sections, which were preceded by extended preambles, which recited the voting by the taxpayers of New Orleans of the special tax referred to upon certain conditions set forth in the property tax payers’ petition made the basis of said election, to be exclusively devoted to specifically enumerated purposes of public im *326 provements, the levying of the said tax hy the common council of New Orleans hy Ordinance No. 15,319 upon the said conditions, .and providing for the establishment of the contemplated public systems of sewerage and water, and the necessary legislative action to make thoroughly effective the conditions .so imposed upon the tax, and to cause the purposes of the tax levy to be fully carried out. The bill was entitled “An act to make effective the vote and levy of the special tax by the property taxpayers of the city of New ■Orleans for water, sewerage, and drainage purposes by authorizing the capitalization of •said tax by the issuance of 50-year bonds of the city of New Orleans under certain conditions and with certain privileges and restrictions, providing for the payment of the principal and .interest thereof, for the disposition of the said bonds and the- proceeds thereof, and defining the powers and duties •of the board of liquidation with reference thereto; by constituting and establishing a sewerage and water board for the .city of New Orleans, and defining its powers, duties, rights, and obligations with reference to the public, the city council, the board of liquidation, and the drainage commission, and.vice versa; by authorizing the city of New Orleans, through said board, to acquire all necessary property rights and franchises by purchase, construction, or expropriation, either within or without the city, necessary and proper for her public systems of sewerage and water, and in such case to assume as part of the purchase price existing mortgages on said property, and to provide for the payment of the principal and interest of such as are assumed as part of the purchase price existing mortgages on said property, and to provide for the payment of the principal and interest of such assumed debts; and to provide for the violation of said act.”
The bill was adopted by the General Assembly, approved by the Governor in August, 1899, and promulgated under the number 6 of the Acts of the Special Session of 1899 of the General Assembly. Acts 1899, p. 16, No. 6.
On the same day this bill was presented to the Senate a bill was introduced under the heading of “A joint resolution proposing an amendment to the Constitution of the state of Louisiana relative to ratifying and carrying into effect a special tax levied in the city of New Orleans for certain public improvements, and to establish thereon public systems of sewerage and water, the issuance of bonds therefor and the providing ways and means to pay the principal and interest of said bonds.” Acts 1899, p. 6, No. 4.
The proposed amendments were contained in two articles, and were preceded by a section in which it “was resoived by the General Assembly of the state of Louisiana, two thirds of all the members elected to each house concurring, that the following amendment to the Constitution of the state be submitted to the electors of the state at the next election.” This bill was ordered printed in full in the journal, and it therein so appears.
This bill and joint resolution was adopted by both houses, and approved and signed by the Governor on the 18th of August, 1899. It was duly promulgated, and appears among the published acts of the General Assembly passed at the special session of 1899 under the number 4.
These amendments were submitted to the vote of the electors of the state at the general election held on the 17th of April, 1900, and on the 15th day of May, 1900, the Governor of the state announced in a proclamation that the election had resulted in the adoption of the amendment.
It appears from this proclamation that there were throughout the state 32,137 votes for and 1,434 against the amendment, and in the parish of Orleans 17,616 votes for and 312 against the same.
In his reasons for the very able judgment which the district judge rendered he set out what has been done since upon the faith of the ordinances of the city of New Orleans— the vote of the property taxpayers of that city upon the same, the provisions of Act No. 6, p. 16, of the General Assembly of 1899, the submission by the General Assembly of the proposed amendment to the vote of the electors of the state, the adoption of the same by an overwhelming majority of the people not only of the state at large but of the city of New Orleans, the official announcement and promulgation by the Governor of .the. re; suit of thegeneral election; adding; , ...
“For the first time, by this suit, filed F'etj; *328 ruary 18, 1903, objection is made by a taxpayer that all that has been done in the premises is null and void, because the General Assembly, in proposing to the people said amendment to the Constitution, failed to comply with some of the directions of the Constitution in regard to constitutional amendments.”
“The special ground is that article 321 of the Constitution directs that amendments proposed must be read in the respective houses on three separate days, and that this means that said amendments must be read in full; whereas in fact said amendment was read only once in full in each house, and on the other two days in each house was read only by its title, and not in full. It is urged that the title forms no part of the amendment, and that reading the amendment by its title was not the reading of the amendment itself.”
We have carefully read the course of reasoning by which the district judge reached the conclusion that the objections in this ease were not tenable, especially when raised at the times and under the circumstances they were, and we are of the opinion that the judgment he rendered was correct.
It is well to quote the views expressed by Mr. Justice Brewer as the organ of the Supreme Court of Kansas on the matter known as the “Constitutional Prohibitory Amendment,” which are to be found on the report made in the case in 24 Kan. 701. It was contended that a certain amendment to the Constitution of Kansas had not been constitutionally adopted, as it did not appear in full upon the journal, as ordered by the Constitution itself. Judge Brewer said: “The Constitution provides that the ‘proposed amendments, together with the yeas and nays, shall be entered on the journal.’ Const. Kan. art. 14, § 1. Is the failure to enter this amendment at length on the journals fatal? It is well said by counsel that no change can be made in the fundamental law except in the manner prescribed by that law. In the case of Collier v. Frierson, 24 Ala. 100, the court says: ‘We entertain no doubt that, to change the Constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment.’ That case illustrates and enforces this proposition. The Constitution of Alabama required, in order to work an amendment, • that the proposition be approved by two-thirds of the Legislature— a popular vote — and then by two-thirds of the next Legislature. This last approval was wanting, and the court held that the Constitution had not been amended. In other words, proceedings under a Constitution to-change that Constitution must be in accord with the manner prescribed by that Constitution. But this only brings us to the real question in this case: Is a proposition to amend the Constitution in the nature of a criminal proceeding, in which the opponents of change-stand as defendants in a criminal action entitled to avail themselves of any technical error, or mere verbal mistake; or is it rather a. civil proceeding, in which those omissions- and errors which work no wrong to substantial rights are to be disregarded? Unhesitatingly we affirm the latter. The central idea of Kansas law, as of Kansas history, is-that substance of right is grander and more potent than methods and forms. The two important, vital elements in any constitutional amendment are the assent of two-thirds of' the Legislature and a majority of the popular vote. Beyond these, other provisions are-mere machinery and forms. They may not be disregarded, because by them certainty as-to the essentials is secured. But they are not themselves essentials. Take a strong illustration: The Constitution requires that the ‘Secretary of State shall cause the same to be published in at least one newspaper in each county of the state where a newspaper-is published, for three months preceding,’ etc. Suppose a unanimous vote of both houses of the Legislature and a unanimous vote of the-people in favor of a constitutional amendment, but that the secretary had omitted to publish in one county in which a newspaper-was published, would it not be simply an insult to common sense to hold that thereby the will of the Legislature and people had been defeated? Is it within the power of the secretary either through ignorance or design to-thwart the popular decision? Is he given a veto, or can he create one? This may be an extreme case, but it only illustrates the principle. The records of the proceedings of the-two houses are made, not by the houses-themselves, but by clerical officers. True, they are under the control of the respective- *330 houses, but in fact the records are made by-clerks. May they defeat the legislative will? The Constitution does not make amendments dependent upon their approval or their action. To insure certainty and guard against mistake, journal evidence of the amendment and votes is prescribed; but this is mere matter of evidence, and not the substantial condition of constitutional change. In Leavenworth County v. Higginbotham, 17 Kan. 62, a law was upheld although the signature of the presiding officer of the Senate was never affixed to it as the Constitution prescribes, and although the yeas and nays were not entered on the journal of the Senate on its concurrence in certain slight amendments made by the House. See, also, Division of Howard County, 15 Kan. 194.
“Again, in constitutional changes the popular voice is the paramount act. While to guard against undue haste and temporary excitement, to prevent unnecessary and frequent appeals for constitutional amendments, the assent of two-thirds of the Legislature is prescribed as a condition precedent, yet, after all, that which determines constitutional changes is the popular will. This is a government by the people, and whenever the clear voice of tüe people is heard Legislature and courts must obey. True, a popular vote without .previous legislative -sanction must be disregarded. There is no certainty that all who could would take part in such a vote, or that they who did, all realize that it was a final action. It lacks the sanction of law, is a disregard of constitutional methods and limitations, and should be taken as a request for change, rather than as a change itself. But, notwithstanding this, legislative action is simply a determination to submit the question to popular decision. It is in no sense final. No number of legislatures and no amount of legislative action can change the fundamental law. This was made by the people, who alone can change it. The action of the Legislature in respect to constitutional changes is something like the action of a committee of the Legislature in respect to the legislative disposition of a bill. It presents, it recommends, but it does not decide. And who ever thought of declaring a law invalid by reason of any irregularities in the proceedings of the committee which first passed upon it? It is the legislative action which is considered in determining whether the law has been constitutionally passed; and it is the popular action which is principally to be considered in determining whether a constitutional amendment has been adopted.”
We have recited in this ease with great minuteness in detail the facts and circumstances under which the General Assembly acted in adopting the proposition to submit this amendment to the electors of the state for the purpose of showing how thoroughly informed each house and the members of each house must have been as to the action taken in this matter; particularly how thoroughly advised they must have been through provisions of Act No. 6, which act was simultaneously passing through both of the houses themselves, and which covered substantially the same subject. It is not pretended that full notice of that act in its different stages was not given to the members of the houses. The people of the state were called upon through the proposed amendment to ratify the provisions of that act.' - . ■ ' - . •
Black, in his work on Constitutional Law (page 326), refers to the word “reading,” though he does so in connection with legislative action in connection with the enactment of “statutes.” The author says: “The Constitutions of many of the states require that a bill, before it shall become a law, shall be read a certain number of times (usually two or three) in each house. In respect to the manner of such reading the provision is considered merely directory, but not with respect to the fact itself. If the Constitution is obeyed in the latter particular, the statute is void. * * * Where the requirement is that the bill shall be read three times, it is the usual practice of legislative bodies to have it read twice by title merely, and once at length, and this is considered sufficient to make its enactment lawful, unless the constitutional provision is so expressed as to make it imperative thát each reading should be of the entire contents of the bill.”
We do not understand that a constitutional requirement which simply declares in general terms ■ that a “bill” should be “read” twice or three times in each house before it can be enacted into a law, would carry with it the necessity of reading over each section *332 of the bill at each reading, though the word “bill” in its meaning covers “the proposed legislation in its entirety.”
If a constitutional requirement that a “bill” should be read three times, in the absence of a specific declaration that the bill shall be “read in full,” authorizes under parliamentary practice and meaning the reading of something less than each section of the bill, there is no reason why a requirement that “an amendment” shall be read three times without declaring that the amendment should oe read in full should not authorize the reading of something less than the “amendment itself in its entirety.” What is intended to be guarded against is undue haste in the consideration of matters of legislation. The purpose of the requirement is that the subject-matter of the bill or amendment should be brought to the attention of both houses on a certain number of occasions, rather than that the details in each section should be placed each time before the houses.
An entry in the journals of character such as to clearly identify the matter brought up each time with that ultimately adopted as a whole should seem to meet the legal or constitutional requirements. There is no particular requirement as to the form of this entry.
It is said that a title to an article amending a Constitution is a thing neither recognized nor required by law; that a title to an amendment would be entirely out of place. This may be true as to the form in which it should be submitted to the people for their vote at the polls, and also as to the form in which it should be made to appear when adopted; but no good reason can be assigned why’the General Assembly should not, for the purposes of its own action or legislation, attach some designation to a bill or joint resolution proposing an amendment for the purposes of identification and reference. While a title might not be required, there is no reason why, if attached, it should not be utilized in connection with the proposition for an amendment for the purposes of the General Assembly itself.
In dealing with the matter before us it is noticeable that the subject is one of a purely local character, affecting for a limited period the private interests of the property holders in a particular, city — a special departure from and relaxation of a general rule made, granted at the instance of the only parties concerned, for their alleged benefit. Ordinarily, the articles of a Constitution lay down general fundamental rules affecting the whole body of the people. The amendment involved here is not of that kind. Not a single person concerned other than the present plaintiff has taken a step-in opposition to the legality and constitutionality of everything that has been done.
The opposition to the levying of the tax (insignificant in number of persons and in the amount of the values of property from the beginning) was exhausted at the election, for it never manifested itself since. To permit it to successfully advance itself now, and under existing conditions, would be against good faith, good conscience, equity, and justice.
For the reasons assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, affirmed.
BLANCHARD, J., concurs.