O’NIELL, Chief Justice
 

 (dissenting).
 

 After a constitutional amendment has been proposed and submitted to the people by a vote of not less' than two-thirds of the members elected to each house of the Legislature, and after the amendment has been adopted by a majority of the people voting in a general election held throughout the State, no court of justice should have authority to annul the amendment on the ground that there was an error or omission in the procedure preceding the submission of the amendment to the people, or on the ground that the amendment should have been proposed and adopted in the form of two or more amendments, instead of being proposed and adopted as one amendment.
 

 The constitutional amendment which is being annulled by this decision — and which was introduced in the Legislature as House Bill No. 968, and became Act No. 384 of 1940 — received not only the required two-thirds vote but almost a unanimous vote in both the Senate and the House of Representatives. The House calendar on 'pages 408 and 409, shows that the vote in the House of Representatives, on final passage of this proposed constitutional amendment, was 90 yeas to no nays. And the Senate calendar on pages 466 and 467 shows that the vote in the Senate, on final passage of the bill as amended, was 35 yeas to 3 nays. And when the bill as amended came back to the House it was adopted unanimously ■ — -by a vote of 79 yeas to no nays. This proposed amendment, with twenty-seven other proposed amendments which were adopted at the same session of the Legislature, was published by the Secretary of State in sixty-four local newspapers throughout the State, with the announcement that the proposed amendment would be submitted to the voters for their approval or rejection at the election to be held on November 5, 1940. The publication was made twice within the period not less than thirty days nor more than sixty days previous to the election; and the publication appeared in the sixty-four local newspapers published, respectively, in each and every one of the sixty-four parishes in the State, as provided in Article 21 of the Constitution. Every voter in the State, therefore, knew or had every possible opportunity to know that this proposed constitutional amendment, with the twenty-seven other proposed amendments, would be submitted to the voters for their approval or rejection at the general election to be held on November 5, 1940.
 

 My understanding of Article 21 of the Constitution is that proposed constitutional amendments cannot be submitted to the electors for their approval or rejection at any other election except “an election for Representative in the Legislature or in Congress.” That seems quite certain from the requirement that the publication of all proposed constitutional amendments in every parish in which a newspaper is published shall be made twice within not less than thirty days nor more than sixty
 
 *582
 
 days “preceding an election for Representative in the Legislature or in Congress.” The inference from this is that if the Legislature does not designate some other general state election or general congressional election, the constitutional amendment shall be submitted at the next general election after the Legislature adjourns, whether that election be an election for Representatives in the Legislature or an election for Representatives in Congress. There would be no reason for requiring that a constitutional amendment shall be published not less than thirty days nor more than sixty days preceding a general state election or congressional election unless the requirement means that the publication shall be made not less than thirty days nor more than sixty days preceding the general state election or congressional election at which the amendment is to be submitted to the electors for their approval or rejection. The session at which the Legislature adopted the joint resolution proposing the constitutional amendment which we are now considering adjourned on July 11, 1940. The next election for representatives in the Legislature or in Congress was the presidential election held on November 5, 1940. If the constitutional amendments which were proposed in the session of the Legislature of 1940 had not been submitted to the electors at that election, the amendments could not have been submitted for a period of two years thereafter; that is, until the congressional election to be held in November, 1942.
 

 Thé Secretary of State therefore knew —just as everybody else knew — that the •election at which all of the twenty-eight proposed constitutional amendments were to be submitted to the people for their adoption or rejection was the congressional or presidential election to be held on November 5, 1940. That is why the Secretary of State published all of the twenty-eight proposed amendments with the declaration that they would be submitted to the voters at the congressional election to be held on November 5, 1940.
 

 If the Secretary of State had withheld this proposed amendment from the batch of twenty-eight proposed amendments, and had published to the world that this proposed amendment would be submitted to the voters at some other election than that at which 'the twenty-seven other amendments were to be submitted, the action of the Secretary of State, with regard to this amendment, would have been wrong, and subject to complaint, if not in fact fraudulent. But the Secretary of State submitted this amendment at the election which — no one can doubt — the Legislature would have designated if the Legislature had not neglected accidentally to designate the election. It is said in the prevailing opinion in this case that the reason why the date of the election was omitted by the Legislature “is left purely fo conjecture, since the record is silent on the point”. I have no doubt whatever that the omission was an accident. It is not conceivable that this omission was made for the purpose of deceiving the electors, or for the purpose of giving to some dissatisfied taxpayer a cause for enjoining the submission of the proposed amendment to a vote of the people, or for the purpose of giving the Secretary of State an excuse for refusing,
 
 *584
 
 if he should see fit to refuse, to submit this proposed amendment to the voters for their approval or rejection.
 

 The record discloses — and it is conceded in the prevailing opinion in this case- — that the total number of votes cast for or against this amendment was 274,-419, and that there was a majority of 6,667 votes cast in favor of the amendment; the vote being 140,543 for and 133,-876 against the amendment. The fact that the majority in favor of the amendment was comparatively small is a matter of no importance except perhaps to show that the voters manifested a keen interest in this amendment. The important fact is that the total number of votes cast for or against the amendment was far above the average total number of votes cast for or against all of the amendments that were adopted at that election. This amendment was No. 3 on the ballot. The average total number of votes cast for or against each amendment that was adopted on that day was 268,494; which was 5,925 votes less than the total number of votes cast for or against amendment No-. 3. The total number of votes cast for or against amendment No. 3 was greater than the total number of votes cast for or against any other amendment adopted at that election, except three amendments, namely, No-. 1, No. 2 and No. 5. No 1 was the amendment which abolished the poll tax registration; No. 2 was the amendment adopting the Civil Service System; and No. 5 was the amendment reducing the license tax on motor vehicles from $15 to $3. The total number of votes cast for or against amendment No. 3 is highly important because it shows how unimportant was the omission of the Legislature to designate the date of the election in the amendment. Nobody would have observed the date in the amendment if it had been there. And it is certain that nobody was deprived of his right to vote for or against this amendment by the neglect of the Legislature to designate the date of the election in the amendment itself. For that reason the complaint of the six taxpayers in this case that the Legislature failed to designate the date of the election in this constitutional amendment would not be a sufficient cause of action even if the suit had been brought to enjoin the submission of the amendment.
 

 The other ground on which the court is now annulling this constitutional amendment is the charge that the Legislature, in submitting the amendment, violated this provision in Article 21 of the Constitution, namely:
 

 “When more than one amendment shall be submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately.”
 

 That does not mean that each and every change that may be made in an amendment of the Constitution shall be the subject of a separate and distinct proposal, or separate joint resolution of the two' Houses of the Legislature. It means,primarily, that, when two or more proposed amendments, or joint resolutions, appear on the same ballot, they must he arranged so that a voter can vote for or against any one of them separately. It is generally conceded by the courts that the spirit of
 
 *586
 
 this provision in the Constitution may be violated if two or more separate and independent changes are submitted in one proposal, or one joint resolution. And in such cases the courts may correct the error if it is complained of by way of an injunction to prevent the Secretary of State from printing the proposed amendment on the official ballot, as in the case of Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549, 94 A.L.R. 1502, or if the Secretary of State makes the complaint in defense of a mandamus suit to compel him to print the proposed amendment on the official ballot, as in the case of State ex rel. Morris v. Mason, Secretary of State, 43 La.Ann. 590, 9 So. 776.
 

 But the members of the Legislature, first of all, and necessarily, must exercise their-judgment, when several changes in the provisions of the Constitution are proposed to be made at one time, and must decide whether the several proposed changes in the Constitution are so dependent upon each other that they ought to be submitted as one amendment, or are so independent and disconnected that they ought to be submitted as separate amendments. And when the Legislature has decided, in any given case, by the vote of two-thirds or more of the members of each House of the Legislature, that it is better that a proposed amendment should be submitted as only one amendment, and not as two or more separate amendments — and when a majority of the people by their votes have ratified and affirmed that decision — no court of justice should have the right to question the wisdom of,it.
 

 We had that question before us less than four months ago, in the case of Isom J. Guillory v. Governor Jones, decided on the 3d day of March, and reported in 197 La. 165, 1 So.2d 65. Judge Guillory sued to annul a constitutional amendment which was adopted at the same election at which the amendment which is now being annulled was adopted. One of Judge Guillory’s complaints was the same as in this case; that is, that the amendment had several independent and disconnected objects, and wrought diverse changes in an article of the Constitution. But we held, unanimously, that the case was one of those instances where all of the proposed changes had to be embodied in one proposal, or one joint resolution. The doctrine of the decision is stated in the headnote, thus:
 

 “The constitutional requirement that two or more constitutional amendments submitted at the same election [shall] be so submitted as to enable the electors to vote on each amendment ‘separately’ means that each amendment or concurrent resolution shall be submitted as a separate amendment, so that the'electors may vote for or against each amendment separately, but it does not mean that each and every change to be made in a section or an article of the Constitution shall be the subject of a separate and independent concurrent resolution.”
 

 In the case which I have referred to, where John A. Morris brought a mandamus suit to compel L. F. Mason, Secretary of State, to publish and to print on the
 
 *588
 
 official ballot for the November election, in 1891, a proposed constitutional amendment, one of the reasons why the Secretary of State refused to publish or submit the proposed amendment was that it contained several separate and distinct objects. The several objects are indicated in the title given to the proposed amendment, in the joint resolution, thus [43 La.Ann. 590, 9 So. 777] :
 

 “Article on levees, schools, charities, pensions, drainage, lotteries, and general fund.”
 

 The court, after analyzing the proposed amendment, said:
 

 “Disincumbered of its verbiage of statement, the foregoing is a fair analysis of the measure proposed. The question for solution is, does this proposition constitute and contain the substance of more than one amendment, and violate, either in terms or by fair implication, the following provision of article 256 of the constitution, viz.:
 

 “ ‘When more than one amendment shall be submitted at the same time they shall be so submitted as to enable the electors to vote on each amendment separately?’
 

 * * *
 

 “We have been able to find and have been cited to but one case in which this question has been treated, and that is State v. Timme [54 Wis. 318], 11 N.W. 785, in which the court say:
 

 “ ‘We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view.’ ”
 

 This court, therefore, in the case cited, held that the proposed amendment was valid because it had only one general purpose in view, notwithstanding it dealt with seven or more separate and distinct subj ects and would have wrought diverse changes in the Constitution if the amendment had been adopted by the vote of the electors. As we well remember it was defeated. In that case the court had the right to inquire into the wisdom of the Legislature in submitting the several amendments as only one amendment, because the people had not adopted the amendment when the court decided the case. In the suit of Kerby v. Luhrs', which was brought to enjoin the Secretary of State from printing the proposed amendment on the official ballot, the Supreme Court of Arizona announced the general rule to be that when two or more amendments constitute a “workable whole” they should be submitted as one amendment.
 

 The rule was recognized by this court long ago, in the case entitled Saunders v. Board of Liquidation, reported in 110 La. 313, 34 So. 457, 460, that, after an amendment of the Constitution has been proposed and submitted to the people by a vote of two-thirds or more of the members elected to each House of the Legislature, and has been approved and adopted by a majority vote of the people, the amendment becomes a part of the Constitution itself, and no one has a right then to sue to annul it. In the Saunders case, a taxpayer, like the six taxpayers in this case, sued to annul an
 
 *590
 
 amendment of the Constitution; and the defendants argued that the taxpayer was estopped by his failure to sue for an injunction before the amendment was finally adopted. The court, unanimously, sustained the plea that the taxpayer was estopped by his failure to sue before the amendment was voted upon by the people; and the court dismissed the taxpayer’s suit. Through Chief Justice Nicholls, the court said:
 

 “As he [the taxpayer] was silent then, good conscience requires that he must keep silent now. It is perfectly evident that this estoppel will forever silence all taxpayers,” et cetera.
 

 The court went on to say, in the Saunders case, that all of the proceedings prescribed by the Constitution for amending it were matters of procedure which lost their importance if and when the proposed amendment actually received the favorable votes of two-thirds or more of the members elected to each House of the Legislature and was actually approved and adopted by a majority vote of the people.
 

 A similar ruling was made in the case of Board of Liquidation v. Whitney-Central Trust & Savings Bank, 168 La. 560, 563, 122 So. 850, 851, and in Middleton v. Police Jury, 169 La. 458, 125 So. 447. And the same doctrine has been maintained by other courts of last resort in the following cases: Taylor v. King, 284 Pa. 235, 130 A. 407; Armstrong v. King, 281 Pa. 207, 126 A. 263; Hollinger v. King, 282 Pa. 157, 127 A. 462; Ruler v. York County, 290 Pa. 427, 433, 139 A. 136, 138; West v. State, 50 Fla. 154, 39 So. 412; Collier v. Gray, 116 Fla. 845, 854, 157 So. 45; State ex rel. Landis, Attorney General, v. Thompson, 120 Fla. 860, 163 So. 270; and State v. Herried, 10 S.D. 109, 72 N.W. 93.
 

 The rulings in the three Alabama cases cited in the prevailing opinion in this case are not at all persuasive. In Collier v. Frierson, 24 Ala. 100, the Constitution required that after a proposed constitutional amendment was adopted by the votes of the people it had to be ratified by a two-thirds majority of each House of the Assembly, or Legislature. The amendment in question was adopted by the people, but in the act of ratification by the Assembly this amendment “was entirely omitted” from the list of amendments which were ratified. The court held, of course, that the proposed amendment which was omitted from the list of amendments that were ratified was not ratified. In Johnson v. Craft, 205 Ala. 386, 87 So. 375, the Legislature attempted to delegate to the Governor, the authority to set the date for the election at which the constitutional amendment would be voted on. The Constitution of Alabama required the Legislature to set the date of the election. By a vote of four to three the members of the Supreme Court of Alabama annulled the amendment. Each one of the three justices who dissented, namely, Justice Gardner, who is now Chief Justice, and Justices Thomas and Somerville, wrote a dissenting opinion. The case was decided in February 1921, and in July of that year the court decided the case of Hooper v. State ex rel. Fox, 206 Ala. 371, 89 So. 593, in which the facts and issues were exactly the same as in Johnson v. Craft. Two of
 
 *592
 
 the justices, namely, Justice Thomas and the present Chief Justice Gardner, again dissented. Justice Somerville said that he concurred in the decree on the ground of stare decisis, or merely because the decision was adverse to his opinion in Johnson v. Craft. I respectfully submit that the. first of these Alabama cases is not appropriate and that the dissenting opinions in the two other cases are in harmony with the rule prevailing in Louisiana and in all other states in which the question has been decided. The majority opinion in these two cases is not only not controlling in this state but is contrary to the decisions of this court which I have cited, and particularly the decision in Saunders v. Board of Liquidation, 110 La. 313, 34 So. 457.
 

 In the prevailing opinion in this case the court points out that in the case of East Jefferson Waterworks District v. Caldwell, 170 La. 326, 127 So. 739, 742, the court said that the case of State ex rel. Morris v. Mason, Secretary of State, was filed and decided at a time of widespread political excitement in the State. Notwithstanding that statement in the East Jefferson Waterworks District case the court expressly approved the decision in State ex rel. Morris v. Mason, Secretary of State; and the court quoted with approval the concurring opinion delivered by Justice McEnery in State ex rel. Morris v. Mason, Secretary of State, thus:
 

 “I think the various pretexts set up by defendant are the merest technicalities. If .they are to be approved, there is a virtual denial of the sovereignty of the people. The people might at once abdicate their boasted power, and bestow it upon a chosen few.”
 

 In the East Jefferson Waterworks District case the court had also this to say:
 

 “In the Saunders-Board of Liquidation case, the organ of the court quotes, with apparent approval, from the opinion rendered by the Supreme Court of Kansas, in the case known as the ‘Constitutional Prohibitory Amendment,’ [Prohibitory Amendment Cases], 24 Kan. 700, from which quotation we excerpt the following:
 

 “ ‘The two important vital elements in any constitutional amendment are the assent of two-thirds of the legislature, and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because by them certainty as to the essentials is secured. But they are not themselves the essentials. * * *
 

 “ ‘Again, in constitutional changes the popular voice is the paramount act. While to guard against undue haste and temporary excitement, to prevent * * * frequent appeals for constitutional amendments, the assent of two-thirds of the legislature is prescribed as a condition precedent, yet, after all, that which determines constitutional changes is the popular will. This is a government by the people, and, whenever the clear voice of the people is heard, legislatures and courts must obey.’
 
 ”
 

 It is said in the prevailing opinion in this case that this constitutional amendment, which is being annulled, “provides for the adoption of an administrative and a financial code in violation of the constitutional
 
 *594
 
 provision embodied in section 18 of Article 3 against the Legislature adopting any code of laws by general reference to such code.” That pronouncement in the prevailing opinion in this case is not only unsound but out of place. The question of constitutionality of the so-called code of laws is not before us in this suit. But, if we were warranted in considering in this case the question whether this constitutional amendment is contrary to the prohibition in section 18 of Article 3 of the Constitution, we must not forget that this constitutional amendment is not a statute but a constitutional amendment.
 

 I confess also that I do not see the relevancy of the reference, in the prevailing opinion in this case, to the fact that Mr. Jerome A. Hayes while acting Budget Officer reduced the appropriation for the Charity Hospital.
 

 It is said in the prevailing opinion that the court is now asked to declare that the Orleans Levee Board can repudiate the bonds which it has issued by destroying “the source provided by law for liquidating the debt.” None of the attorneys for the defendants in this case contends or believes for one moment that the State or the Levee Board can repudiate or impair the obligation represented by the Levee Board’s bonds, by abolishing the tax which has been levied to pay the bonds. The repealing of Article XVI-A, which was only an emergency provision in the Constitution, and which has served its purpose, was in line with the general plan of this amendment, of abolishing all useless boards and commissions. The Reparation Commission had authority merely to adjust claims for damages resulting from the Caernarvon Crevasse. The commission had nothing whatever to do with the issuing of bonds or the levying of the tax to pay the bonds. That authority was vested in the Board of Commissioners of the Orleans Levee District; and the authority was carried out; and that board was not abolished or affected by the constitutional amendment which we are now considering.
 

 In the case of State ex rel. Bahns et al. v. City of New Orleans, 163 La. 777, 112 So. 718, from which the court now quotes the method of adopting constitutional amendments, the statute which was in contest, and which was declared unconstitutional insofar as it provided for paying an increase in the salary of the city judges out of the judicial expense fund, was not a constitutional amendment at all, but was only a statute, increasing the salaries of the judges of the city court and providing that the increase should be paid out of ,thé judicial expense fund. It was argued on behalf of the judges of the city court, who were the relators in the suit, that, inasmuch as the statute had received the favorable vote of two-thirds or more of the members elected to each House of the Legislature, the statute had the effect of a constitutional amendment, and therefore should prevail over the provision in section 95 of Article 7 of the Constitution directing the handling of the judicial expense fund. It was necessary that the statute should have the vote of two-thirds or more of the members of each House of the Legislature, because it is declared in section 34 of Article
 
 *596
 
 3 of the Constitution that salaries of public officers, whether fixed in this Constitution or otherwise, may be changed by the vote of two-thirds of the members of each house of the Legislature. This court, of course, rejected the argument that because this salary-raising statute had received the favorable vote of two-thirds or more of each House of the Legislature it had the effect of a constitutional amendment. It was in that connection that the court described the proceedings which are necessary to adopt a constitutional amendment — the essential features of which proceedings are the two-thirds vote of each House of the Legislature and the adoption by a majority of the votes of the people themselves. The statute which the city judges contended had the effect of a constitutional amendment was, of course, never submitted or intended to be submitted to the voters for their approval or rejection. When the plaintiffs in the present case quoted from the opinion in State ex rel. Bahns et al v. City of New Orleans, the requirements for adopting a constitutional amendment, I was impressed with the idea that they were hard-pressed for a decision by this court to support their argument.
 

 The generalities quoted in the prevailing opinion in this case, from Cooley’s Constitutional Limitations, from Jameson on Constitutional Conventions, from Corpus Juris, from Duncan v. McCall, 139 U.S. 449, 11 S.Ct. 573, 576, 35 L.Ed. 219, and from McCreary v. Speer, 156 Ky. 783, 162 S.W. 99, are not contrary to the doctrine of the decisions rendered by the Supreme Court of Louisiana, maintaining that, after a constitutional amendment has been proposed by the vote of two-thirds or more of the members elected to each House of the Legislature, and has been approved by a majority vote of the people voting at a general election held throughout the State, nobody has a right of action to annul the amendment on the ground that there was an error or omission in the proceedings leading up to its submission to the people, or on the ground that the members of the Legislature should have submitted the amendment in the form of two or more amendments, instead of submitting it as one amendment.
 

 In the prevailing opinion in this case the court cites Oakland Paving Co. v. Hilton, 69 Cal. 479, 11 P. 3. That decision was expressly repudiated and virtually overruled by the Supreme Court of California, in the case of Oakland Paving Co. v. Tompkins, City Marshal, 72 Cal. 5, 12 P. 801, 1 Am.St.Rep. 17. In that case the court declared, pointblank, that the decision in the case of Oakland Paving Co. v. Hilton should not be considered as authority— thus:
 

 “This question is not a new one in this court. In People v. Strother, 67 Cal. 624, 8 P. 383, it was the only issue of any importance, and it was squarely decided that the amendment had been constitutionally adopted. This was in bank [en banc], and there was no apparent dissent. This decision was in October, 1885, and- in the following May in the case of Oakland Paving Co. v. Hilton [69 Cal. 479], 11 P. 3, an opinion was rendered by Justice Thornton, which was concurred in by Mr. Justice McKee, holding to the contrary. The other
 
 *598
 
 members of the court who participated in that decision based their concurrence on other grounds.
 

 “It is contended that in this condition of the decisions, the question ought to be considered an open one. We do not accede to this proposition. In the case of People v. Strother the point was squarely presented, was the only one involved, and was plainly and unequivocally decided. We see no reason why it is not entitled to the usual authority of a precedent; nor do we concede that in so deciding there was error.”
 

 It is conceded in the prevailing opinion in this case that this court has never heretofore declared a constitutional amendment unconstitutional — meaning, of course, an amendment that does not violate any provision in the federal Constitution. It is said, though, that the court has had occasion to declare unconstitutional a clause embraced in a constitution regularly adopted by a convention called by the Legislature for that purpose, but subject to certain restrictions set forth in the Act of the Legislature convoking the convention. The court refers to the case of State v. American Sugar Refining Co., 137 La. 407, 68 So. 742, 745. In that case the act of the Legislature, being Act No. 1 of the Extra Session of 1913, proposing to call the convention, was submitted to the vote of the electors throughout the state at a general election, and was approved by a majority vote of the electors. The Constitution itself, however, after being adopted by the Constitutional Convention of 1913, was not submitted to the people for their approval or rejection. It was for those reasons that the court claimed authority to consider the question of validity of one of the articles, being Article 190, of the Constitution of 1913. On that subject the court said:
 

 “The Legislature in enacting Act No. 1, Extra Session of 1913, paid no attention to the alleged restriction in the call of the Governor, and that official signed the act, and the people approved all the restrictions therein set forth.
 

 “When the people, acting under a proper resolution of the Legislature, vote in favor of calling a convention, they are presumed to ratify the terms of the call, which thereby become the basis of the authority delegated to tbe convention. 6 R.C.L. § 18, p. 27.
 

 “Act No. 1 of the Extra Session of 1913 calling for a convention, with full power and authority to frame and adopt, without submission to the people, a new Constitution of the state, subject, however, to a number of restrictions enumerated in said act, having been adopted by the people, constituted a mandate to the convention of 1913.”
 

 I have never disputed the general rule, which is supported by the many law books cited in the prevailing opinion in this case, that the question of validity of a constitutional amendment, when properly presented, is a question for the courts to decide. The principle for which I stand is that, after a constitutional amendment has been submitted to the people by a vote of not less than two-thirds of the members elected to each House of the Legislature, and has been adopted by a majority vote of the people voting in a general state-wide election,
 
 *600
 
 the courts should not annul the amendment on the ground merely that there was a defect or an omission in the procedure leading up to the submission of the amendment, or on the ground that the Legislature should have divided the amendment into two or more propositions, instead of submitting it as one proposition.
 

 The annulling of the constitutional amendment in this instance will have very far-reaching and troublesome consequences. The amendment has been in effect nearly seven months. In that time many executive orders have been issued and executed in pursuance of this constitutional amendment. Vast sums of money forming State funds have been transferred from one department to another. Public boards and commissions have been abolished, and their functions transferred to other departments of the government. Some of the most important laws enacted by the Legislature in its regular session of 1940 will be subject to annulment by the courts in consequence of this decision. Other laws enacted at that session of the Legislature may not be affected by this decision. • It will be a difficult task, therefore, for the State’s officials — and particularly for the courts of justice — to untangle the maze of trouble and bewilderment that must follow this decision. ■
 

 The one feature of the case, however, that transcends in importance all other features is that the court is setting aside the edict of the people themselves, expressed at the polls. There is no period of prescription, or time-limit, that could bar a suit like this, as to which it has been decided that each and every taxpayer in the State has a right of action. The result is that all of the many constitutional amendments that have been adopted by the people since the Constitution of 1921 was adopted are now in danger of being annulled at the suit of any one of the many taxpayers throughout the State, if any one of them can discover a flaw or an omission in the proceedings which led up to the adoption of the amendment, or if any taxpayer can convince a majority of the members of the court that the Legislature should have submitted the amendment in the form of two or more amendments instead of submitting it as one amendment.
 

 We are reminded in the prevailing opinion rendered in this case that the Constitution of the United States guarantees to every State in the Union a republican form of government. I respectfully submit that when a comparatively small group of men who are the members — or a majority of the members — of a court of last resort annul an amendment of the Constitution of their State merely because of an error or omission in the proceedings which led up to the submission of the amendment to the people and its adoption by the people — or because the members of the court are of the opinion that the amendment should have been adopted by the people as two or more amendments instead of being adopted as one amendment — the proceeding seems not consistent with the theory of a republican form of government. In fact it is apt to tax the people’s understanding of President Lincoln’s high resolve that government of the people, by the people, for the people, shall "not perish from the earth.
 

 
 *602
 
 For these reasons I respectfully ckcline to subscribe to the decision rendered in this case.