182 So. 661

**STATE ex rel. PORTERIE, Atty. Gen., v. BOARD OF LIQUIDATION OF STATE DEBT et al.**

No. 34962.

June 22, 1938.

Rehearing Denied June 27, 1938.

Gaston L. Porterie, Atty. Gen., James O'Connor, First Asst. Atty. Gen., and Lessley P. Gardiner, Second Asst. Atty. Gen., for appellant.

George M. Wallace, of Baton Rouge, and Herbert W. Waguespack and W. Blair Lancaster, Jr., both of New Orleans, for appellee.

ROGERS, Justice.

As this is a matter of great public importance and entitled to special preference under the law, we have endeavored to give it the immediate attention necessary. The issues have been so clearly stated and analyzed, and supported with pertinent authorities by our learned brother below in a well considered opinion, we have decided to adopt it.

The opinion of the judge of the district court is in the following words and figures, to-wit:

"This is a suit by the Attorney-General of the State of Louisiana against Edward Jones and Company, Inc. and the Board of Liquidation of the State Debt of the State of Louisiana, wherein he seeks to enjoin the Board of Liquidation of the State Debt and the individual members thereof, from complying with the provisions of Act No. 3 of the Regular Session of Louisiana for the year 1938, which authorizes the Board of Liquidation of the State Debt to issue refunding bonds of the State of Louisiana in the principal amount of $8,612,200.00, for the purpose of refunding the outstanding Serial Gold 4½% Bonds of the State of Louisiana, dated January 1, 1914, and aggregating the sum of $8,612,200.00, and maturing in numerical order on November 1st of each of the years, beginning 1938 to 1964, inclusive, which were issued in accordance with the provisions of Article 324 of the Constitution of the State of Louisiana for the year 1913.

"The petition filed by the Attorney-General recites that on the 26th day of May, 1938, Edward Jones and Co., Inc. made a proposal to the Board of Liquidation of the State Debt, offering to purchase $8,612,-200.00, refunding bonds of the State of Louisiana, to be issued for the purpose of refunding a like amount of Serial Gold Bonds dated January 1, 1914, of the State of Louisiana, now outstanding.

"That on the same day and date the Board of Liquidation of the State Debt at a special meeting called for the purpose, adopted, a resolution accepting the said proposal. The Attorney-General, who is a member of said Board, however, was not present at said meeting. He was represented by Leslie P. Gardiner, Second Assistant Attorney-General, who refrained from voting.

"It is represented in plaintiff's petition that the said resolution, unless the same be held to be invalid by the Court, constitutes a contract between the State of Louisiana and the said Edward Jones and Co., Inc. It is further represented in plaintiff's petition that by Act No. 3 of the Legislature of Louisiana for the year 1938, the Legisla-

ture has ratified, confirmed and approved the said contract; that said Act No. 3 of 1938 was approved by the Governor of the State of Louisiana on the 15th day of June, 1938, and it has been promulgated in the official journal.

"That the Governor of the State of Louisiana, claiming to act under the authority of Section 27 of Article 3 of the Constitution of Louisiana, as amended by Act 70 of the Regular Session of 1936, certified to the Legislature that the immediate passage of said Act, which was House Bill No. 399 of the Regular Session of the Legislature of 1938, was necessary; and that the said Act No. 3 of 1938, is now in full force and effect and has been in full force and effect from and since the time the same was approved by the Governor, unless the same is declared unconstitutional, null and void, and of no force and effect for the reasons set out in plaintiff's petition.

"That pursuant to the authority purportedly conferred upon him by the said resolutions of May 26, 1938, Andrew P. Tugwell, Treasurer of the State of Louisiana, caused to be published in the Times Picayunne of New Orleans; The New Orleans Item; the Bond Buyer, New York; and the Chicago Daily News, Chicago, Illinois, on dates set out in affidavits attached to plaintiff's petition a notice of sale of $8,612,200.00 of said Refunding Bonds of the State of Louisiana, all as will more fully appear from a report of the said Treasurer incorporated into the minutes of the Board of Liquidation of the State Debt at its meeting held on June 14, 1938; and that

as will appear from said report as a result of said notice a bid for said Refunding Bonds more advantageous to the State than the first bid of May 26, 1938, of Edward Jones and Company, Inc. was submitted to said Treasurer by a syndicate headed by the Hibernia National Bank in New Orleans, and that there was also submitted another bid even more advantageous than that submitted by the Hibernia National Bank by said Edward Jones and Co., Inc., which latter bid was finally accepted by said Treasurer, and the said Refunding Bonds were awarded by him to said Edward Jones and Co., Inc. under the terms of said bid.

"That after the adoption of the said resolution of the Board of Liquidation of the State Debt of date May 26, 1938, and before the passage of Act No. 3 of the Regular Session of 1938, the Board of Liquidation of the State Debt, on the 14th day of June, 1938, at a special meeting called for that purpose, adopted a resolution approving the meeting called for that purpose, adopted a resolution approving the awarding of the said Refunding Bonds to Edward Jones and Company, Inc. That on the 16th day of June 1938, at a special meeting called for that purpose the Board of Liquidation of the State Debt adopted its resolution providing for the issuance of $8,612,200.00 of Refunding Bonds, in accordance with the award heretofore referred to. The Attorney-General attacks the said resolutions of the Board of Liquidation of the State Debt as ultra vires the powers and authority of the said Board and claims that the same are null and void and of no effect.

"Plaintiff avers that Act 3 of the Regular Session of 1938 is unconstitutional and all of said resolutions are ultra vires and powers and authority of the Board of Liquidation of the State Debt, and therefore void for the following reasons:

"(1) That Article 324 of the Constitution of Louisiana for the year 1913, under which said Serial Gold Bonds, dated January 1, 1914, were issued and sold, the provisions of which are continued in full force and effect by paragraph 5 of Article 22 of the Constitution of 1921, *contains no authority for the issuance of Refunding Bonds.*

"(2) That Act No. 3 of the Regular Session of 1938, authorizing the issuance of Refunding Bonds, violates Section 2 of Article 4 of the Constitution of 1921, which provides that the Legislature shall have no power to contract or to authorize the contracting of any debt or liability on behalf of the State, or to issue bonds or other evidences of indebtedness thereof, except for the purpose of repelling invasion or for the suppression of insurrection, and that this prohibition extends to the creation of debt attempted to be made by said Act and to the issuance of Refunding Bonds in evidence thereof.

"(3) That said Act provides that said Refunding Bonds shall be payable out of the same taxes provided for the payment of the Serial Gold Bonds, which are the taxes provided by Article 324 of the Constitution of 1913, and that said taxes provided by said Article for the payment of the outstanding Serial Gold Bonds, can not be extended by a mere act of the Legislature to the payment of Refunding Bonds

issued to refund such Serial Gold Bonds; furthermore said Article 324 of the Constitution of 1913 specifically provides that the taxes therein authorized shall be used to pay the bonds issued pursuant to said Article 1 and that this provision is continued by paragraph 5 of Section 22 of the Constitution of 1921; that therefore, the provisions of said act authorizing the issuance of Refunding Bonds, *which directs the said Refunding Bonds shall be payable out of the same taxes provided for the payment of the Serial Gold 4½% Bonds is null and void.*

"(4) That Article 324 of the Constitution of 1913 unconditionally and irrevocably pledges the faith and credit and resources of the State of Louisiana for the payment in gold coin of the United States of the outstanding Serial Gold Bonds; that the act authorizing the issuance of the Refunding Bonds contains a provision that 'the faith and credit and resources of the State of Louisiana' and 'unconditionally and irrevocably pledged for their payment' and is null and void, the Legislature being without authority to pledge the faith and credit and resources of the State of Louisiana to the payment of said Refunding Bond.

"(5) That Article 324 of the Constitution of 1913 provides that the bonds authorized to be issued pursuant thereto shall mature in not exceeding 51 years from the date of issuance; that the outstanding Serial Gold Bonds issued pursuant thereto bear the date January 1, 1914, and the last maturing bonds of the issue become due August 1, 1964; that the said act authorizing the issuance of Refunding Bonds provides that

they shall mature, beginning August 1, 1939, and that the last maturing bonds shall become due August 1, 1960. *Therefore Section 2 of said Act authorizing the issuance of the Refunding Bonds would permit maturities earlier than the period permitted by Article 324 of the Constitution of 1913, and is for that reason violative of said article.*

"(6) That the resolution prescribing the form and details of the Refunding Bonds provides that they shall be *general obligations of the State* for the payment of the principal of and interest on which the full faith, credit and taxing power of the State of Louisiana are pledged; that Article 324 of the Constitution of 1913 unconditionally and irrevocably pledges the faith and resources and credit of the State to the payment in gold coin of the United States of the principal and interest of the outstanding Serial Gold Bonds, and contains no pledge thereof to the payment of principal and interest of the Refunding Bonds, *and that as a consequence, said refunding bonds can not be general obligations of the State of Louisiana.*

"(7) That there is now on hand in the State Treasury in the 'State Bond and Interest Tax Fund', applicable to the payment of the outstanding Serial Gold Bonds the sum of $354,774.50, which sum should be applied to the payment of the principal thereof, *thereby correspondingly reducing the amount of refunding bonds to be issued;* that use of all moneys in said fund for the payment of premiums due on outstanding Serial Gold Bonds to be called for redemption would result in the issuance of a great-

er amount of Refunding Bonds than is necessary and to that extent, *constitutes the creation of a new debt, which is in violation of Section 2, Article 4 of the Constitution of Louisiana.*

"(8) That the provisions of said Act 3 of 1938 and said resolutions authorizing the issuance of refunding bonds permitting the subrogation thereof as to principal and interest and the reconversion of fully registered bonds into coupon bonds is invalid for the reason that Article 324 of the Constitution of 1913 permits the registration only of the bonds issued pursuant to that article and furthermore said article does not contemplate the reconversion of bonds issued pursuant thereto.

"(9) That the said act and the said resolutions authorizing the issuance of the Refunding Bonds provide for the issuance of Interim Certificates pending the printing and delivery of the definitive refunding bonds, and provide that such Interim Certificates shall be signed only by the Treasurer of the State of Louisiana; that Article 324 of the Constitution of 1913 permits the issuance of Interim Certificates only in lieu of the bonds issued pursuant to said Article, and contains no provision authorizing only the Treasurer of the State of Louisiana to sign Interim Certificates.

"(10) That said resolutions authorizing the issuance of refunding bonds subrogate the holders of the refunding bonds to all rights of the holders of the Serial Gold Bonds to be refunded by the issuance of said Refunding Bonds; and the rights of the holders of said Serial Gold Bonds, as set forth in Article 324 of the Constitution

of 1913, may not be thus impaired, by mere legislative enactment.

"(11) That said Act and said resolutions violate Section 15 of Article 4 of the Constitution of Louisiana, in that they impair the obligation of the contract between the State and the holders of said Serial Gold Bonds, and divest said holders of their vested rights therein.

"(12) That the provision in Section 6 of Act 3 of 1938 authorizing the issuance of the refunding bonds providing that such Act shall take effect immediately upon the approval thereof by the Governor is null and void, and said Act can take effect only at 12 o'clock noon on the 20th day after the Legislature shall have adjourned, and the aforesaid resolutions are null and void as being premature and unauthorized by law at the time of their adoption, for the following reasons, to-wit:

"(a) Senate Bill No. 133, Act No. 70 of the Regular Session of 1936, was amended in the House of Representatives (House Journal, 1936, pp. 857 and 858) before it was passed to third reading, and was not thereafter entered on the journal of the House and Senate, as amended, in violation of Section 1, Article XXI of the Constitution of Louisiana; that the bill as entered on pages 1146 and 1147 of the printed House Journal for June 24, 1936, at the time of the vote on the final passage thereof was taken in the House, is the original Senate Bill No. 133 and not the bill as amended by the House. Furthermore, that the bill as entered on pages 1134 and 1135 of the printed Senate Journal for June 30, 1936,

at which time the bill was signed by the Lieutenant-Governor and President of the Senate in open session, was the original Senate Bill No. 133 and not the bill as amended by the House and the bill as set out on pages 1582 and 1583 of the printed House Journal for July 1, 1936, at which time said bill was signed by the Speaker of the House of Representatives, was original Senate Bill No. 133 and not the bill as amended by the House. That such journals therefore disclose that the bill as passed by the Legislature was not the same as the bill submitted to the vote of the people on November 3, 1936.

"(13) That Article 324 of the Constitution of 1913 permits the redemption of outstanding bonds issued pursuant thereto only with funds on hand and available for such purpose in the sinking fund provided by said Article 324, and does not permit the issuance of Refunding Bonds to redeem said outstanding bonds.

"(14) That the provisions of Section 3 of the resolution of the Board of Liquidation of the State Debt, adopted June 16, 1938, authorizing the issuance of the refunding bonds, which provide that the holders of such refunding bonds are subrogated to all the rights of the holders of the bonds refunded thereby, including the right to the levy on all property on which general State taxes are now or may hereafter be levied of an annual tax of $1\frac{36}{40}$ mills on the dollar of assessed valuation, which tax was included as a part of the State tax and six mills, authorized by the Constitution of 1913, to be levied for general purposes, is null and void.

"(15) That neither the act authorizing the issuance of the Refunding Bonds (Act 3 of the Regular Session of 1938), nor the resolution of the Board of Liquidation of the State Debt, of date June 16, 1938, prescribing the form and details thereof makes provision for the redemption of such refunding bonds, and that failure to make such provision for redemption violates Article 324 of the Constitution of 1913, which provides that bonds 'issued pursuant thereto may in the discretion of said Board, to be exercised before issuance, be made redeemable at any time on payment of principal and accrued interest, plus a premium of 4% upon the principal.

"(16) That Section 3 of Article 10 of the Constitution of Louisiana, and Act 109 of 1921, and Act 49 of 1924, enacted pursuant thereto, limit the rate of the State tax to 5¾ mills on the dollar of assessed value, whereas the said act and resolutions of the Board of Liquidation of the State Debt contemplate a contract between the State and the purchasers or holders of said refunding bonds to levy a state tax for the payment thereof, which will result in exceeding said constitutional limit of State taxation.

"All of the defendants filed answers generally denying the allegations of plaintiff's petition.

"For answer to Article XII of plaintiff's petition, the defendants say:

" 'The allegations of fact contained in Article XII, except such as are herein specially admitted, are denied. Further an-

swering the several paragraphs of this Article, defendants say:

" '(1) The power to call and redeem the Serial Gold Bonds at any time upon the payment of the principal, accrued interest and a premium of 4% on the principal, contained in Article 324 of the Constitution of 1913, includes the power and authority in the Legislature and the Board of Liquidation of the State Debt to issue and sell refunding bonds in order to obtain the funds necessary to call and redeem said Serial Gold Bonds.

" '(2) Act No. 3 of 1938 does not violate Section 2 of Article IV of the Constitution of 1921. The Refunding Bonds are authorized by the special provisions of Article 324 of the Constitution of 1913 and paragraph Fifth of Article XXII of the Constitution of 1921, and are not prohibited by the general provisions of Section 2 of Article IV of the Constitution of 1921, moreover, said refunding bonds do not create a new debt, within the prohibition of said Section 2 of Article IV.

" '(3) The allegations of fact contained in this paragraph are denied.

" '(4) That it is within the discretion of the Board of Liquidation of the State Debt and the Legislature as an incident to their power to issue the Refunding Bonds, to pledge the faith and credit and resources of the State to the payment of said Refunding Bonds, such having been pledged to the payment of the Serial Gold Bonds refunded.

" '(5) That the fixing of the maturities of the refunding bonds is a matter entire-

ly within the discretion of the Legislature and the Board of Liquidation .of the State Debt. The maturities provided for the Refunding bonds do not violate Article 324 of the Constitution of 1913.

" '(6) That it is within the discretion of the Legislature and the Board of Liquidation of the State Debt, as well as their duty, in issuing said refunding bonds, under the authority of Article 324 of the Constitution of 1913, to provide that the same shall be general obligations of the State of Louisiana.

" '(7) The allegations of fact contained in this paragraph are denied. That the Legislature and the Board of Liquidation of the State Debt had the authority to refund the whole of the principal including premium and accrued interest of the Serial Gold Bonds outstanding as of the date of the resolution of said Board June 16, 1938.

" '(8) That the matters of providing for the registration of the refunding bonds and their reconversion are entirely within the discretion of the Legislature and said Board.

" '(9) That the issuance of Interim Certificates signed only ·by the Treasurer is a matter entirely in the discretion of the Legislature and the said Board, and is a provision for the convenience of the State.

" '(10) That the Legislature and the Board of Liquidation of the State Debt have the power to subrogate the holders of the refunding bonds to ·all rights of the holders of the Serial Gold Bonds, and

that such provision in no manner impairs the rights of the holders of the Serial Gold Bonds.

" '(11) The allegations of fact contained in this paragraph are denied.

" '(12) The allegations of fact contained in this paragraph are denied; further answering it is alleged that Senate Bill No. 133 of 1936 (Act No. 70 of 1936) a proposed constitutional amendment, was entered on the journals of the Legislature in accordance with the requirements of the Constitution, and the same bill passed both Houses and was submitted to and adopted by the people lawfully.

" '(13) The allegations of fact contained in this paragraph are denied.

" '(14) The allegations of fact contained in this paragraph are denied; further answering, it is alleged that the Legislature and the said Board have the power and authority to subrogate the holders of the refunding Bonds to all rights ·of the holders of the Serial Gold Bonds refunded, including the right to levy the tax referred to for the payment of such bonds.

" '(15) Whether or not the Refunding Bonds should be issued subject to the option of redemption is a matter within the discretion of the Board of Liquidation of the State Debt and the Legislature.

" '(16) That the general provisions of Section 3 of Article X of the Constitution of 1921 must yield to the special provisions of Article 324 of the Constitution of 1913 and paragraph Fifth of Article

XXII of the Constitution of 1921, which have not been violated.'

"Opinion.

"The Court will dispose of various attacks made by the Attorney-General as they appear in the petition filed.

"(1) The first attack is that Article 324 of the Constitution of 1913 under which the Serial Gold Bonds dated January 1, 1914, were issued and sold, the provisions of which Article are continued in effect by paragraph 5 of Article 22 of the Constitution of 1921 contains no authority for the issuance of Refunding Bonds. While it is true that this article as it appears in the Constitution of 1913 and as continued in effect by paragraph 5 of Article XXII of the Constitution of 1921, does not expressly confer such authority, it was expressly provided in said Article 324 Constitution of 1913 that the Serial Gold Bonds therein referred to could in the discretion of the Board of Liquidation of the State Debt, be made redeemable at any time on payment of principal and accrued interest, plus a premium of four percentum upon the principal, which redemption shall be in the reverse order of maturity at whatever dates the said Board may see proper and fix. Redeemable bonds were issued pursuant to this authority. Article 324, Constitution of 1913, provided that notice of redemption, in case redeemable bonds were issued, should be given by thirty days' advertisement in certain designated newspapers, and that interest should cease at the maturity of the coupon next falling due. It can not, therefore, be denied that the Serial Gold Bonds issued were subject to call and redemption by paying a premium of 4% on the principal, together with interest.

"The question here presented is does the power to call and redeem these bonds include the authority to issue refunding bonds for the purpose of raising the necessary funds to pay the Serial Gold Bonds, including the premium of 4% upon the principal of said bonds. In my opinion the power to call and redeem these Serial Gold Bonds does include the authority to issue refunding bonds to an amount sufficient to retire the Serial Gold Bonds in the manner prescribed in Art. 324, Constitution of 1913. There is nothing in said Article or in Paragraph 5 of Article XXII, Constitution of 1921, denying such authority, and as it has been shown that to issue said refunding bonds will effect a substantial saving to the State of Louisiana, I can see no legal or practical objection thereto.

"Learned counsel for defendants in his (their) brief have this to say:

" 'The authority to issue refunding bonds, though not specifically included in Article 324 of the Constitution of 1913, is necessarily included in the authority to call and redeem. The framers of the Constitution of 1913 undoubtedly had this very method of raising funds to call and redeem the Serial Gold Bonds in mind when the provisions of Article 324 were adopted. The Serial Gold Bonds dated January 1, 1914, issued under Article 324 of the Constitution of 1913, are them-

selves refunding bonds. Being familiar with the history of the State debt since its creation, the framers of Article 324 of the Constitution of 1913, must have felt that there would come a time when it would either be necessary, or advantageous to the State, to refund the Serial Gold Bonds authorized by that Article, and I believe they intended that the provisions of Article 324 authorizing the calling and redeeming of the Serial Gold Bonds should be construed as including the authority in the Board of Liquidation of the State Debt to issue and sell refunding bonds for the purpose of raising funds necessary for the calling and redemption of the Serial Gold Bonds.

" 'The correctness of this view is indicated, when we consider the fact that Article 324 of the Constitution of 1913 authorized the Legislature to transfer the excess above $675,000 annually of the collections on account of the 1⅘oths mills tax constituting the State Bond and Interest Tax Fund to the General Fund. The annual charges imposed upon the State Bond and Interest Tax Fund amounted in 1913 to approximately the amount of money that was to be retained in that fund annually. In view of this provision, the framers of the Constitution of 1913 must have known that no substantial surplus would accumulate the State Bond and Interest Tax fund from year to year; and that if the Board of Liquidation of the State Debt could ever call and redeem the Serial Gold Bonds it would have to issue refunding bonds in order to obtain funds necessary to pay the principal, interest and premium on the Serial Gold Bonds.'

"The Court concurs in the view thus expressed. No authority to the contrary has been referred to.

"Being of the opinion that the authority of the Board of Liquidation to call and redeem the Serial Gold Bonds issued pursuant to Art. 324, Constitution of 1913, included the authority of said Board to issue Refunding Bonds, it seems to me that the attack upon the validity and constitutionality of Act 3 of 1938 necessarily must fail and it is so held.

"II. The second attack made upon the constitutionality and validity of Act 3 of 1938 and the resolutions referred to that it violates Section 2 of Article IV of the Constitution which prohibits the Legislature from contracting any debt or creating any liability on behalf of the State or to issue bonds or other evidences of indebtedness thereof except for the purpose of repelling invasion or for suppression of insurrection. The contention is made that the prohibition contained in this article extends to the creation of debt attempted by Act 3 of 1938 and to the issuance of Refunding Bonds in evidence thereof.

"The question presented is whether or not refunding bonds create a debt or liability of the State?

"It seems to me that this question has been squarely decided in the negative by our Supreme Court in the case of Tonry v. Board of Levee Commissioners, 186 La. 159, 171 So. 836.

"In that case, the Supreme Court quotes with approval the following from 44 Corpus Juris, 1132 par. 4065:

"'A municipal corporation does not incur a new debt or increase its indebtedness, within the meaning of constitutional or statutory limitations, where it * * * extends an existing indebtedness, as by issuing funding bonds, etc.' (Page 837.)

"The Supreme Court said:

"'This is the law as announced by a number of decisions of both the federal and state courts throughout the United States. The case at bar presents a situation where an existing indebtedness created under a special law and to be amortized from taxes levied by the same law is to be merely readjusted and refunded for the sole purpose of reducing the interest rate. No new debt is created. The old debt is not paid, but continues to exist save only that the mere form of the evidence of that indebtedness is changed.'

"In that case the Supreme Court also said:

"'Therefore, the court is of the opinion that the holders of the proposed refunding bonds to be issued and sold by virtue of the resolution adopted by the defendant board on the 22d day of December, 1936, *are subrogated to the rights* of the holders of the bonds to be refunded.'

"In the case of State v. City of Daytona Beach, 126 Fla. 728, 171 So. 814, the same question was presented to the Supreme Court of Florida and there it was held that the issuance of refunding bonds 'merely evidenced an extension or renewal in a new form of the original bonded indebtedness.'

"To the same effect was the decision of the Circuit Court of Appeals (U.S.) in the case of Board of Education v. Woodmen of the World, 8 Cir., 77 F.2d 31.

"In that case the Court said (page 34):

"'It is said that, with both issues outstanding, the debt limit is exceeded. * * * Refunding it does not increase the debt of the municipality.'

"There are innumerable authorities to the effect that the issuance of refunding bonds does not constitute the incurring or creation of indebtedness, among which, in addition to those above quoted are the following: Fairfield v. Rural Independent School Dist. of Allison, 8 Cir., 116 F. 838, 54 C.C.A. 342, affirmed 187 U.S. 643, 23 S.Ct. 843, 47 L.Ed. 346; Commonwealth ex rel. v. Cannon, 308 Pa. 321, 162 A. 277; Williams v. Rock Hill, 177 S.C. 82, 180 S. E. 799, 100 A.L.R. 604; Dallas County v. Lockhart, 128 Tex. 50, 96 S.W.2d 60; City of Huron v. Second Ward Sav. Bank, 8 Cir., 86 F. 272, 49 L.R.A. 534.

"The proposition contained in Act 3 of 1938 and the aforesaid resolutions of the Board of Liquidation of the State Debt *is simply one to refund a debt already created* at a lower rate of interest.

"As stated in Commonwealth ex rel. v. Cannon, 308 Pa. 321, 162 A. 277:

"'The * * * refunding of a debt previously created and existing is not an

increase of that indebtedness, but is mere-ly a continuation thereof.'

"I therefore hold that the second ground of attack upon the constitutionality and validity of Act 3 of 1938 is without merit.

██ "The provision of Section 2 of Article IV of the Constitution invoked by the plaintiff is a general provision, whereas paragraph 5 of Article XXII is a special provision.

"Effect must be given to the special provision which is that:

" 'The bonded indebtedness of the State established by Article 324 of the Constitution of 1913 now outstanding and unpaid is hereby recognized; and all rights and remedies provided in said article for the payment and liquidation thereof and all provisions contained therein for the cancellation of the bonds and coupons, for the preservation of the evidence of said cancellation, and the giving of public notice thereof, are continued in full force and effect.'

"Authorities to the effect that effect must be given to the special provisions, notwithstanding the limitations contained in general provisions are: State ex rel. Collens v. Clinton, 26 La.Ann. 406; State ex rel. Garland v. Guillory, 184 La. 329, 339, 166 So. 94; State v. Gutierrez, 15 La.Ann. 190.

"In my opinion there is, therefore, no merit in the contention to the effect that the refunding bonds are prohibited by the limitation that the Legislature shall have no power to contract or authorize the con-tracting of any debt or liability on behalf of the State or to issue bonds or other evidences of indebtedness thereof.

██ "III. The point raised in the third attack is that the Refunding Bonds are made payable out of the same taxes provided for the payment of the Serial Gold bonds and that said taxes provided by Article 324, Constitution of 1913 for the payment of outstanding Gold Bonds *can not be extended by mere act of the Legislature* to the payment of Refunding Bonds issued to refund the Gold Bonds; it is also contended that Art. 324, Constitution 1913, specifically provides that the taxes therein authorized shall be used to pay the bonds issued pursuant thereto and that this same provision is contained in the Constitution of 1921.

"Therefore, that Act 3 of 1938 which provides that the refunding bonds shall be payable out of the same taxes is unconstitutional;

"If, as I have already held, it is permissible to issue the refunding bonds, it is likewise permissible to pay the same out of the same taxes dedicated to the payment of the original bonds. After all the issuance of refunding bonds is merely a readjustment of an existing debt and the security provided for the payment of the Gold Bonds should necessarily be the same as that for the payment of the Refunding Bonds. The third attack is therefore, found to be without merit.

██ "IV. As to the fourth attack, that is, that Act 3 of 1938 provides that 'the faith and credit and resources of the

State of Louisiana are "unconditionally and irrevocably pledged" for the payment of the refunding bonds, and the Legislature is without right to do this,' I am of the opinion that the power to call and redeem the Gold Bonds and the right of the Board to rearrange and readjust said bonded indebtedness carries with it the right to pledge the faith, credit and resources of the State, to the payment of the same. It would be an impossible situation to admit the power to redeem and call the Gold Bonds and to readjust this indebtedness and at the same time deny to the Board of Liquidation of the State Debt the right to offer and furnish the same security. Therefore, I hold that this contention is without merit, and I also hold that the fifth objection, that is to the variation in the maturities of the Gold Bonds and the Refunding Bonds is without merit. Certainly neither the State nor the holders of the bonds can suffer by reason of the variation in the maturity of the bonds to be issued.

■ "VI. The sixth objection is that the resolution prescribing the form and details of the Refunding Bonds provides that they shall be *general obligations* of the State for the payment of both principal and interest. If the Gold Bonds, the issuance of which were authorized by Art. 324 of the Constitution of 1913 were general obligations of the State and I believe they were, as their payment was not limited to any particular source of revenue, I believe the Board of Liquidation had the right to prescribe the form and details of said Refunding Bonds and to provide that they shall be general obligations of the State. Indeed, as no special fund was provided by the framers of the Constitution of 1913 from which the Gold Bonds were to be paid, these bonds are among the general obligations of the State. As a matter of fact they were themselves refunding bonds. See Art. 324 which begins:

" 'In order to pay the State's bonded debt of Eleven Million, One Hundred and Eight Thousand, Three Hundred Dollars, maturing January 1, 1914, the Board of Liquidation of the State Debt is hereby authorized [etc.]'

"The act of pledging the 'faith and credit and resources of the State' to the payment of the Serial Gold Bonds, in my opinion, constituted those bonds *general obligations* of the State. If therefore the act of refunding is merely to readjust and rearrange for the payment of an existing debt, which is among the general obligations of the State, I see no valid objection in providing that the refunding bonds shall be considered general obligations of the State.

■ "It is claimed that there is now on hand in the State Treasury in the State Bond and Interest Fund applicable to the payment of the outstanding Serial Gold Bonds the sum of $354,774.50 which should be applied to the payment of the principal of said bonds, thereby reducing the debt; it is further claimed that to use any of said money for the payment of the premium due on outstanding Gold Bonds to be called for redemption would result in the necessity of issuing a greater amount of Refunding Bonds than is necessary.

and to that extent constitutes the creation of a new debt in violation of Section 2, Art. IV of the Constitution. Put another way, the failure to use the money on hand to pay the principal of said bonds will make it necessary, if $8,612,200 of refunding bonds are to be issued, *to increase the State debt.*

"The defendants deny the facts set out in sub-paragraph 7 of paragraph XII of plaintiff's petition; in other words that it is proposed by the Board of Liquidation to use the sum appearing in this paragraph of plaintiff's petition to pay the premium on outstanding Gold Bonds.

"The evidence shows that on June 16, 1938, when the Board of Liquidation provided for the issuance of refunding bonds, there was not sufficient money in the State Bond and Interest fund to pay the principal and interest of the Serial Gold Bonds falling due August 1, 1938.

"Reference to Exhibit O, offered by the defendants discloses the fact that on June 16, 1938, the Board of Liquidation of the State Debt, authorized a transfer of $692,822.50 from the State's 'General Fund' of 1938 to the 'State Bond and Interest Fund' for the purpose of making available a sufficient sum in said fund to pay the Serial Gold Bonds maturing August 1, 1938, the interest accruing to said date on all bonds of said issue now outstanding and unpaid, as well as a premium of 4% on the bonds of said issue, dated January 1, 1914, maturing in varying amounts on August 1 of each of the years 1939 to 1964, inclusive, which the said Board called for redemption on the next ensuing interest payment date, and that said transfer was actually made.

"There is nothing to show that it is the intention of the Board to create a new debt or increase the old debt.

"According to the certificate of the State Treasurer, the State Bond and Interest Tax Fund has been credited with the sum of $622,822.50 from the General Fund. From this the Serial Gold Bonds payable August 1, 1938 will be paid. I do not think however that this should affect the right of the Board of Liquidation of the State Debt to issue refunding bonds in the total sum of $8,612,200. for the reason that as of date August 1, 1938 the State Bond Interest Tax Fund will owe the 'General Fund' the amount payable on the Gold Bonds, August 1, 1938.

"Besides, at date of the resolution providing for the refunding bonds, the total amount of the outstanding bonds and of the refunding bonds was the same. I can not, therefore, agree that the Board has created a new debt or that there has been any violation of Section 2 of Article IV of the Constitution..

"VIII. The provisions of Act 3 of 1938 relating to the registration of the refunding bonds, in my opinion, are harmless. Certainly if the Board of Liquidation has the power to call and redeem the Serial Gold Bonds and to issue refunding bonds, it has the power to provide for the registration thereof as to principal and interest. After all, the provisions for registration of the refunding bonds and the reconversion of fully registered bonds into coupon bonds

are for the convenience of the holders of the bonds and of the State. There is no inhibition of such a provision in Art. 324, Constitution of 1913.

 "IX. The next contention is that said resolution authorizing the issuance of Refunding bonds provide for the issuance of Interim Certificates pending the printing and delivery of the definitive Refunding Bonds and provide that such Interim Certificates shall be signed only by the Treasurer of the State of Louisiana. It is claimed that Article 324 of the Constitution of 1913 permits the issuance of Interim Certificates only in lieu of the bonds issued pursuant to said article and contains no provision authorizing the State Treasurer only, to sign such certificates.

"If the Legislature had the right to confer the power to refund, it also had the right to provide for the issuance of Interim Certificates. If there is nothing in either the Constitution of 1913 or 1921 to prohibit the refunding of said debt, likewise, there is nothing to prevent the issuance of such Interim Certificates.

"I am therefore of the opinion that the objection is without merit.

 "X. Section 10 of paragraph 12 of plaintiff's petition is that the resolutions of the Board of Liquidation of the State Debt authorizing the issuance of refunding bonds subrogate the holders of refunding bonds to all rights of the holders of the Serial Gold Bonds, to be refunded by the issuance of said refunding bonds, and the rights of the holders of said Serial Gold Bonds, as set forth in Article 324 of the

Constitution of 1913, may not be thus impaired by mere legislative enactment.

"It seems to me that the fact that the Serial Gold Bonds are subject to call and redemption at any time upon the payment of principal and accrued interest and a premium of 4%, any right of the holders of said Serial Gold Bonds must necessarily yield to the State's right to redeem said Serial Gold Bonds according to the article of the Constitution under which they were authorized.

"In the case of Tonry v. Board of Levee Commissioners, 186 La. 159, 171 So. 836, supra, the Supreme Court expressly held that the holders of the proposed refunding bonds therein referred to became subrogated to the rights of the holders of the bonds refunded.

"The Board of Liquidation of the State Debt having chosen to redeem the Serial Gold Bonds by issuing refunding bonds it seems to me became its duty to protect the holders of the refunding bonds the same as the holders of the Serial Gold Bonds were protected. I therefore hold that there is no merit in this contention.

 "XI. As to the objection contained in paragraph 11 of plaintiff's petition, that is, that Act 3 of 1938 and the resolutions of the Board of Liquidation of the State Debt violate Section 15 of Article IV of the Constitution, in that they impair the obligation of the contract between the State and the holders of the Serial Gold Bonds, and divest said holders of their vested rights, I am of the opinion that the exercise by the State of the right to redeem said Gold

Bonds in no way impairs the obligations of the contract. If under the provisions of Article 324, the State has the right to call and redeem these bonds, that provision of the Constitution became part of the contract between the State and the holders of the Serial Gold Bonds, and the holders thereof necessarily acquired the same with notice of the fact that the State, if it saw fit to do so, could call and redeem the same.

"XII. The contention here is that the provisions of Section 6 of Act No. 3 of 1938, authorizing the issuance of the Refunding Bonds, providing that such Act shall take effect immediately upon approval by the Governor is null and void, and that said Act can take effect only at 12 o'clock noon on the 20th day after the Legislature shall have adjourned, and the resolutions of the State Bond and Tax Board referred to in plaintiff's petition are null and void as being premature and unauthorized by law at the time of their adoption, for the reason that Senate Bill No. 133, which became Act 70 of the Regular Session of 1936, was amended in the House of Representatives before it was passed to third reading, and was not thereafter entered on the journals of the House and Senate, as amended, in violation of Section 1 of Article XXI of the Constitution of Louisiana, it seems to me is likewise not well founded.

"Article 21 of the Constitution, Section 1, provides:

"'Propositions for amending the Constitution may be made by the Legislature at any session, and if two-thirds of the members elected to each house shall concur therein, after such proposed amendment or

amendments have been read in both houses on three separate days, such proposed amendment, or amendments, together with the yeas and nays thereon, *shall be entered on the journal*," etc.

"In construing a similar provision of the Constitution of 1898, the Supreme Court in the case of Saunders v. Board of Liquidation of City Debt, 110 La. 313, 314, at pages 330 and 331, 34 So. 457 had this to say (page 463):

"'We do not understand that a constitutional requirement which simply declares in general terms that a "bill" should be "read" twice or three times in each house before it can be enacted into a law, would carry with it the necessity of reading over each section of the bill at each reading, though the word "bill" in its meaning covers "the proposed legislation in its entirety."

"'If a constitutional requirement that a "bill" should be read three times, in the absence of a specific declaration that the bill shall be "read in full," authorizes under parliamentary practice and meaning the reading of something less than each section of the bill, there is no reason why a requirement that "an amendment" shall be read three times without declaring that the amendment should be read in full should not authorize the reading of something less than the "amendment itself in its entirety." What is intended to be guarded against is undue haste in the consideration of matters of legislation. The purpose of the requirement is that the subject-matter of the bill or amendment should be brought to the attention of both houses on a certain number of occasions, rather than that the de-

tails in each section should be placed each time before the houses.

"'An entry in the journals of character such as to clearly identify the matter brought up each time with that ultimately adopted as a whole should seem to meet the legal or constitutional requirements. There is no particular requirement as to the form of this entry.'

"Reference to the Senate journal shows that the bill was introduced and read in full, and entered on the journals in full, May 28, 1936. On May 28, 1936, the bill was read in full and entered in the journal in full and referred to a committee. On June 3, 1936, it was reported favorably, read in full and entered on the journal in full. On June 4, 1936, the bill was read in full, entered on the journal in full and finally passed. The yeas and nays were entered.

"The journal of the House of Representatives shows that the bill was received June 8, 1936, from the Senate, and the title printed in the journal. By reference to page 493 of the House Journal it appears that the bill was read in full and referred to a committee. Thereafter it appears on page 730 of the House Journal that the bill was reported favorably; the title printed in the journal, and the bill referred to the Legislative Bureau. Thereafter, as shown on page 825 of the House Journal, the bill was reported by the Legislative Bureau with amendments; the original bill was entered on the journals and the legislative bureau amendments entered on the journal. After that the bill was read the second time, in full as amended, and was

originally entered on the journal in full. The legislative bureau amendments were adopted and printed in the journal and the bill was engrossed and ordered passed to third reading. On pp. 1146 and 1147 it appears that the bill was read in full, as amended, and the original entered on the journal; then that the bill was finally passed by the House.

"The bill was thereafter received back in the Senate from the House, with amendments. It was read in full and entered on the journals as it was originally introduced, and the legislative bureau amendments made by the House were concurred in by the Senate. Thereafter the bill was entered on the journals as originally introduced and signed by the Lieutenant-Governor, as shown on pages 1334–1336. On pages 1581, 1582 and 1584 of the Senate Journal it appears that the bill was entered on the journal of the House of Representatives and signed by the Speaker of the House. The Journals show that the amendments were read in both houses when they were adopted.

"It seems to me that the bill was .sufficiently read on three separate days in each house and the yeas and nays entered on the journals on final passage as required by the Constitution. There is no requirement that a proposition to amend the Constitution shall be entered in full on the journals, nor does there seem to be any particular provision relating to the form of entry that should be made. It would therefore seem to me in the absence of any particular requirement otherwise that the entries in the journals of both the House and Senate are of such character as easily to identify the

matter brought up each time with that ultimately brought up and adopted as a whole.

"As previously shown the bill as originally introduced was read in full three separate times in each house and it was read in full on two separate dates in the House, and the amendments were spread upon the journals of both the House and Senate. I believe, therefore, that there was substantial compliance with the constitutional provision relating to the passage of legislative measures.

"The Court has been referred to a case entitled in re: Senate File No. 31, 25 Neb. 864, 41 N.W. 981, which involved a proposition to amend the constitution of Nebraska. The provision of the Constitution of Nebraska referred to in the opinion required that 'proposed amendments shall be entered on the journals.' (Page 983.) The proposition to amend the constitution was passed by the Senate by the necessary three-fifths majority and entered at length on the journal. The proposition was amended in the House, and as amended was passed by this body by the requisite majority, and entered at length on the house journal. After that the House amendments were concurred in by the requisite majority of the Senate, and such amendments entered at length on the Senate journal. In these circumstances it was held that there was sufficient compliance with the Constitution.

"In this case the journal of the House of Representatives shows that Senate Bill No. 133 was read as amended; therefore what the House adopted was the bill as amended by the Legislative Bureau. In the Senate the bill was read in full, and the amendments were read in full, and the yeas and nays taken upon the concurrence of the Senate in the amendments.

"The title of Senate Bill No. 133 of 1936 is as follows:

" 'A Joint Resolution proposing an amendment to Article III, Section 27, of the Constitution of Louisiana, providing that those acts the necessity for the immediate passage of which shall have been certified to the Legislature by the Governor, or Acting Governor, shall become effective immediately.'

"Most all of the amendments consisted of changes in grammatical expression to aid in construing the act. There were no amendments in substance. The only amendment made in the title was to change 'Article III, Section 27' to read, 'Section 27 of Article III.' The title was sufficient as an identifying reference and was read along with the rest of the bill at every reading in the house and in the senate.

"In the case of Saunders v. Board of Liquidation, City Debt, 110 La. 313, 314, 34 So. 457, the Supreme Court quoted with approval the following from an opinion rendered by the Supreme Court of Kansas in the case known as the Constitutional Prohibitory Amendment, 24 Kan. 700, from which quotation we cite the following:

" " 'The two important, vital elements in any constitutional amendment are the assent of two-thirds of the Legislature and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because by them certainty as to the es-

sentials is secured. But they are not themselves essentials. * * * The records of the proceedings of the two houses are made, not by the houses themselves, but by clerical officers. True, they are under the control of the respective houses, but in fact the records are made by clerks. May they defeat the legislative will? The Constitution does not make amendments dependent upon their approval or their action. To insure certainty and guard against mistake, journal evidence of the amendment and votes is prescribed; but this is mere matter of evidence, and not the substantial condition of constitutional change. * * *

" 'Again, in constitutional changes the popular voice is the paramount act. While to guard against undue haste and temporary excitement, to prevent * * * frequent appeals for constitutional amendments, the assent of two-thirds of the Legislature is prescribed as a condition precedent, yet, after all, that which determines constitutional changes is the popular will. This is a government by the people, and whenever the clear voice of the people is heard Legislature and courts must obey.'

"As was stated in the case of East Jefferson Waterworks District No. 1 v. Caldwell & Co., 170 La. 326, 127 So. 739, 741, involving Act 51 of 1926, which was a constitutional amendment:

" 'An entry in the journals of character such as to clearly identify the matter brought up each time with that ultimately adopted as a whole should seem to meet the legal or constitutional requirements.'

"The Court further said that:

" 'The purpose of the requirement is that the subject-matter of the bill or amendment should be brought to the attention of both houses on a certain number of occasions, rather than that the details in each section should be placed each time before the houses.'

"I believe that in view of the decisions of our Supreme Court in the case of State ex rel. Morris v. Mason, Secretary of State, 43 La.Ann. 590, 9 So. 776, East Jefferson Water Works District No. 1 v. Caldwell & Co., 170 La. 326, 127 So. 739, Board of Liquidation of State Debt v. Whitney-Central T. & S. Bank, 168 La. 560, 122 So. 850, and Middleton v. Police Jury, 169 La. 458, 125 So. 447, the objection here made to the alleged irregularity in the adoption and passage of Act 70 of the Regular Session of 1936 is without merit, and that when it was finally ratified by the people it became properly a part of the organic law of the State, and that therefore Act 3 of 1938, passed in pursuance thereof is valid and constitutional.

"This being true the resolutions of the State Bond and Tax Board approving the action of the Board of Liquidation of the State debt in issuing the refunding bonds, and the resolutions of the Board of Liquidation of the State Debt, based on Act 3 of 1938 are not null and void as being premature or unauthorized by law at the time of their adoption.

"XIII. The contention made by the Attorney-General in section 13 of paragraph 12 that Article 324 of the Constitution of 1913 permits the redemption of the

Serial Gold Bonds issued pursuant thereto only with funds on hand and available for such purpose in the sinking fund provided for in said Article and does not permit the issuance of refunding bonds to redeem said Serial Gold Bonds, in my opinion is without merit. The power to issue the refunding bonds to raise the necessary funds with which to redeem said Serial Gold Bonds, which I have held the Board of Liquidation of the State Debt has it seems to me the right to do answers the objection here raised. In other words, if the Board has the power to call and redeem the Serial Gold Bonds it has the power to issue said refunding bonds to raise the necessary funds with which to redeem said Serial Gold Bonds, the said Serial Gold Bonds can be redeemed with funds other than those on hand and available for such purpose in the sinking fund provided for in said Article 324.

"XIV. The objection contained in section 14, paragraph 12 is practically the same as the objection raised in section 10 of the same paragraph. In any event, I am of the opinion that the authority to call and redeem the Serial Gold Bonds includes the authority to issue refunding bonds to pay the principal, interest and premium on the Serial Gold Bonds, and that therefore the Legislature had the right to subrogate the holders of the refunding bonds to rights similar in all respects to the rights of the holders of the Serial Gold Bonds.

"XV. The resolution of the Board of Liquidation of the State Debt provides that the refunding bonds shall be issued without option of redemption.

"The Attorney-General contends that the failure of the Legislature and of the Board of Liquidation to make provision for the redemption of the refunding bonds violates Article 324 of the Constitution of 1913, which provides that bonds issued pursuant thereto may in the discretion of said Board, to be exercised before issuing, be made redeemable at any time upon payment of principal and accrued interest, plus a premium of 4% on the principal.

"There is nothing in Article 324 of the Constitution of 1913 prohibiting such a provision in the refunding bonds.

"Article 324 of the Constitution of 1913 related entirely to the original Serial Gold Bonds.

"It is my view that it was within the discretion of the Legislature and the Board of Liquidation of the State Debt, in the exercise of their authority, to call and redeem the Serial Gold Bonds and to issue refunding bonds for the purpose of raising the necessary funds to pay the principal and accrued interest and the premium of the Serial Gold Bonds, to provide that the refunding bonds should not be subject to redemption.

"XVI. The last contention of the Attorney-General is that Section 3 of Article X of the Constitution of Louisiana and Act 109 of 1921 and Act 49 of 1924, enacted pursuant thereto, limited the rate of the State tax to 5¾ mills on the dollar of assessed value, whereas the said Act and resolution of the Board of Liquidation contemplate a contract between the State and the purchasers or holders of said refunding bonds to levy a tax for the payment thereof

which will result in exceeding said constitutional limit of State taxes. The provision limiting the rate of State tax to 5¾ mills on the dollar of assessed value is a general provision of the Constitution.

"Article 324 of the Constitution of 1913 fixes the rate of the tax forming the State Bond and Interest Tax Fund at 1⅗oths of a mill on the dollar, and provides that said tax shall be entered as a part of the State tax of six mills authorized elsewhere in the Constitution of 1913.

"Paragraph 5 of Article 22 of the Constitution of 1921, which is a special provision, continues the provision of Article 324 of the Constitution of 1913 in full force and effect.

"If at any time it should become necessary to increase the tax forming the State Bond and Interest Tax Fund, which is now fixed at 1.15 of a mill on the dollar by Act [109] 119 of 1921, the Legislature would be obliged to give effect to the special provision of the Constitution despite the limitation contained in the general provision thereof; in fact, as the refunding bonds are general obligations of the State and the full faith, credit and resources of the State are pledged to their payment, it would be incumbent on the Legislature or the people to make full provision for the payment of these bonds if the·taxes now dedicated and authorized for the purpose are insufficient.

"Under the provision of Section 6 of Article 324 of the Constitution of 1913 the Board of Liquidation is given full power to carry out the provisions of said Article and in its judgment to make and prescribe rules, regulations, conditions and methods in all particulars not inconsistent with the terms of the said Article. This authority, as exercised by the Legislature and the Board of Liquidation of the State Debt has in my opinion been properly exercised.

"For the reasons assigned, judgment will be rendered herein in favor of the defendants and against the plaintiff, recalling the rule heretofore issued, rejecting the plaintiff's demand for a permanent injunction and dismissing this suit.

"Thus done in Open Court on this 20th day of June, 1938.
 "[Signed] Charles A. Holcombe
 "Judge, 19th Judicial District· Court, Division 'B'"

In accordance with his opinion, the judge of the district court rendered judgment in favor of the defendants, Board of Liquidation of the State Debt, the individual members of said Board, viz.: Richard W. Leche, Governor; Earl K. Long, Lieutenant Governor; Ludlow B. Baynard, Auditor; Andrew P. Tugwell, Treasurer; Eugene A. Conway, Secretary of State; Lorris M. Wimberly, Speaker of the House of Representatives; and George M. Wallace, Executive Counsel to the Governor; and Edward Jones & Co., Inc., and against the plaintiff, the State of Louisiana, recalling the rule nisi herein issued, rejecting the plaintiff's demands and dismissing plaintiff's suit. From this judgment the plaintiff appealed.

For the reasons assigned by the judge of the district court, which we have approved and adopted as the opinion of this court, the judgment appealed from is affirmed.