LANDRY, Judge.
Plaintiff appellant, Fred W. Kunz, Jr., a citizen of Jefferson Parish, Louisiana, instituted this suit, and was subsequently joined therein by numerous intervenors, seeking an injunction and/or declaratory judgment to prevent defendant, the Greater New Orleans Expressway Commission (sometimes hereinafter referred to simply as the “Commission”), from carrying out certain contracts with David Volkert & Associates, Inc., and Bache and Co., Incorporated, from further expending the Commission’s revenues in connection with the planning and construction of proposed additions, extensions and improvements to the Greater New Orleans Expressway, (commonly referred to as the Lake Pontchartrain Bridge or Causeway, and sometimes hereinafter referred to as the “Causeway” or “Expressway”), consisting, inter alia of additional traffic lanes and alterations in existing navigational openings, and from issuing and selling revenue bonds to finance construction of the suggested improvements, extensions and additions. Plaintiff’s petition also prayed for judgment decreeing the Commission’s proposed action injurious to him and for declaratory judgment to the effect that Article VI, Section 22 Paragraph (g) (5) of the Louisiana Constitution of 1921, (sometimes hereafter referred to simply as the “Amendment”), which grants the parishes of St. Tammany and Jefferson power and authority to jointly construct the Expressway, issue revenue bonds to finance the cost thereof *437 and charge tolls for its use, prohibits construction of the improvements contemplated by the Commission and also prohibits issuance of additional revenue bonds to finance improvements or extensions to the Causeway if such additional revenue bonds are supported by a dedication of the Special Reserve Fund created from Highway Fund No. 2. Lastly, appellants’ petition prays that the contract entered into by the Commission with the hereinabove named firms, for the designing and planning of the proposed improvements, be declared null and void.
After trial on the merits below, our learned colleague of the trial court dismissed and rejected plaintiff’s demands as well as those of intervenors, Malcolm B. Wright, III, Joel T. Chaisson, R. Warren Landry, Lester J. Millet and Harold Keller, and rendered judgment in favor of defendants, the Commission, Bache and Co., Incorporated, David Volkert & Associates, Inc., Coverdale & Colpitts, Parish of St. Tammany, Parish of Jefferson and the in-tervenor, State of Louisiana, decreeing that Article VI, Section 22, Paragraph (g) (5) of the Constitution, as amended by Act 90 of 1952, authorizes the Commission to improve the presently existing causeway by providing additional traffic lanes and altering its navigational openings, and issue revenue bonds to finance such additions, including the refunding of presently outstanding bonds, and further declaring that such additional revenue bonds may lawfully be supported by the special reserve fund created from State Highway Fund No. 2, as provided in the aforesaid constitutional article.
Plaintiff and the hereinabove named in-terventors whose claims were rejected, have appealed the decision of the lower court assigning error on the part of the trial court in: (1) Holding the applicable constitutional provision authorizes construction of additions, extensions or improvements to or changes in the navigational ports of the existing facility or structure; (2) Declaring the amendment authorizes the issuance of additional revenue bonds to refund outstanding bonds and finance construction of the proposed improvements; (3) Decreeing valid the acts, things and contracts thus far done and entered into by the Commission to execute its intent to construct the proposed additions to the Causeway, and (4) Finding as a matter of law that the proposed improvements are not specifically proscribed by the amendment.
The facts of the present case were developed in the main by admissions in the pleadings and written stipulations accompanied by numerous exhibits. As thus composed, the record reveals appellant Kunz to be a citizen of the State of Louisiana, residing in the Parish of Jefferson and owning real property in both Jefferson and St. Tammany Parishes. For the past five years, and for the year 1965, he has been and is presently the owner of a motor vehicle for which he has secured a license from the State of Louisiana, having paid the requisite fee therefor. The intervenors hereinabove named are shown to possess similar qualifications in the parishes of their respective domiciles.
The Commission is a public corporation formed by contract or agreement between Jefferson and St. Tammany Parishes on October 20, 1954, pursuant to the provisions of LSA-R.S. 33:1321 — 33 :1332, inclusive, to construct, improve, maintain and operate a toll, motor vehicle expressway across Lake Ponchartrain connecting the two parishes. The charter creating the Commission declares said public corporation to be the exclusive agent and instrumentality of the contracting parishes for the above enumerated purposes and further states the rights and obligations of the Commission are those of the principals with respect to any authorized action undertaken or performed by the Commission.
To support, implement and facilitate exercise of the authority of the parishes in question to construct an expressway or causeway pursuant to the provisions of *438 LSA-R.S. 33:1321-33:1332, inclusive, Article VI, Section 22, Paragraph (g) (5) of the State Constitution was amended by Act 90 of 1952, to specifically grant the parishes involved power and authority to j ointly construct the Expressway, issue revenue bonds to finance its construction and charge tolls for its use. The Amendment also sets up a Special Reserve Fund in the State Treasury consisting of all receipts from State Highway Fund No. 2, (that portion of state vehicular license taxes collected from the Parishes of Orleans, Jefferson, St. John the Baptist, St. Charles, Tangipahoa and St. Tammany), not required for prior allocation and not subject to previous dedication. Of the Special Reserve Fund thus established, the first $5,000,000.00 is dedicated or earmarked for construction of approaches to the proposed Causeway and the balance is made available to the exclusive use of the Commission in supplementation of the net tolls and revenues derived from the operation of the expressway, thus providing a source for the prompt payment of interest and principal on outstanding and maturing revenue bonds issued to construct the facility.
After passage of the Amendment, the existing facility was designed, plans and specifications therefor were drawn, revenue bonds aggregating $46,000,000.00 were issued to finance its construction, contracts for its erection were let and the structure was completed and opened to vehicular traffic on August 30, 1956. Since the Causeway was opened for traffic as hereinabove noted, the Commission has each year received substantial sums into the hereinbe-fore mentioned Special Reserve Fund and has used said revenues for the purpose of supplementing net tolls and charges to defray the interest and principal on outstanding and maturing revenue bonds of the issue previously mentioned.
The present controversy resulted from the Commission’s action of February 19, 1964, directing its consulting engineers to prepare preliminary plans for improving the existing structure by altering the facility from a single undivided roadway providing: one lane for vehicular traffic in each direction (its present status), to a multilane-roadway by the construction of additional traffic lanes. In addition the Commission-directed its said engineers to prepare preliminary plans for the improvement of navigational openings in the present facility-primarily by enlarging and elevating such-ports to permit passage of marine craft under the structure with a minimum risk of collision therewith while at the same time-eliminating disruption of vehicular traffic otherwise caused by the necessity of opening draw spans. On the same day, the-Commission instructed its traffic engineers, to make preliminary traffic studies to assist in determining the feasibility of financing, the proposed improvements by issuing revenue bonds sufficient in amount to refund or retire all presently outstanding indebtedness, and pay for the contemplated additions. On May 7 and 8, 1964, the Commission paid $5,000.00 and $8,700.00 to the-consulting and traffic engineers, respectively, for services rendered pursuant to its. directive of February 19, 1964.
Subsequently, on Februarj'- 23, 1965, the Attorney General of the State of Louisiana,, at the request of the Commission’s counsel,, rendered an opinion to the Commission-stating in effect that the Commission could', lawfully, under the Amendment, finance the intended improvements by refunding outstanding bonds and issuing sufficient additional bonds supplemented by the support, afforded by the pledge of the Special Reserve Fund set up from the State Highway Fund No. 2 as provided in the amendment.
Thereafter, on April 14, 1965, the Commission declared its firm intention to proceed with the construction of the contemplated improvements and finance the entire-operation by the issuance of new revenue-bonds adequate to both refund all outstanding bonds and defray the cost of the extensions.
*439 By appropriate action taken September 8, 1965, the Commission authorized its Chairman or Vice-Chairman to execute a ■contract with David Volkert & Associates, Inc. to perform the consulting engineering work required for the construction of the improvements contemplated. On October 22, 1965, the Commission granted its Chairman or Vice Chairman authority to enter into a contract with Bache & Co., Incorporated, appointing said concern the Commis■sion’s financial advisor with respect to the proposed bond issue, and also directed Cov-•erdale & Colpitts to perform the necessary traffic engineering work required for construction of the improvements under consideration.
It is stipulated by the adverse parties that the work to be performed by the traffic ■engineers will he paid for by the Commission out of its current revenues. It is further conceded that when the Commission expends its revenues to assist in making the proposed improvements, it thereby reduces the amount otherwise available to the Commission for maintenance and operation of the existing facility and increases by like amount the sum of State Highway Fund No. 2 moneys required for payment of principal and interest on outstanding bonds. Lastly, it is stipulated that if the Commission constructs the improvements in question and issues additional revenue bonds pursuant to the Amendment’s provision, the sums ultimately paid to the Commission from State Highway Fund No. 2 will substantially exceed the amount required to amortize presently outstanding bonds.
The initial and we believe most forceful argument tendered by counsel for appellants is to the effect the Court should not be swayed or influenced in its decision by the need for proposed additional lanes and improved navigational openings, but rather should decide the issues posed herein solely upon the basis of the authority conferred upon the Commission by the applicable amendment. We concur in the view that need alone, without lawful authorization will neither support nor justify any action by the Commission beyond the scope of its powers granted by law. We find, however, that the question of need for the improvements is a matter for proper consideraion as will hereinafter be shown.
With regard to the question of need, we note in appellee’s brief the following excellent summation of facts:
“The report of Coverdale & Colpitts, Consulting Traffic Engineers to the Commission, and the testimony of Edward L. Wemple, partner of that firm (it was stipulated that the testimony of Mr. Wemple would be the same as the report) leaves no doubt as to the great need for additional traffic lanes to the present causeway and the changes contemplated to the draw spans. (All of the appellants alleged in their petitions that the improvements contemplated are not necessary and serve no useful purpose.) The need is based on safety considerations as well as increased use. During the year 1950-1960 the population of Jefferson
Parish has increased 101% from 103,-873 to 208,769; St. Tammany 43.2% from 26,988 to 38,643; Washington 14.7% from 38,371 to 44,015. During 1960-1964 the increase for Jefferson was 20% to 250,-600; St. Tammany 14.4% to 44,200; Washington 6.6% to- 46,900. This is greatly in excess of the percentage increase attributed to the State as a whole during both periods (21.4% and 7.9% respectively).
Since 1958 the annual traffic utilizing the present facility has increased from 1,275,758 vehicles to 2,002,231. The last five years have seen an average yearly increase of 7.9%. The 1965 increase over 1964 is a staggering 18.9%. This rapid rate of growth is expected to continue.
The average daily traffic volumes for the existing structure have increased since 1960 from 3,740 to 5,490 in 1965. 5,000 vehicles per day is the recognized limit for two-lane highways by numerous *440 states and the American Association of State Highway Officials. This is also the point at which highway widening programs are instituted under good planning methods. There were 42 days in 196S when the facility served in excess of 7,000 vehicles on up to 15,183. Assuming a traffic increase for the next 20 years at the 7.9% average annual rate of increase for the last five years, the 1985 traffic will be 9.2 million vehicles, an increase in average daily traffic from 5,490 to 25,200. A day’s traffic volume of 8,000 vehicles is the limit for good service to Causeway users, a figure already being exceeded at least 30 days a year.
There have been and will continue to be occasions when the Causeway is the only available traffic artery to and from areas north of Lake Pontchartrain, including the Gulf Coast. Hurricane ‘Betsy’ was a stark reminder of this fact. During ‘Betsy’ U. S. Route 51 around the west end of Lake Pontchartrain was closed by fallen trees and U. S. Routes 11 and 90 northeast of New Orleans to the Gulf Coast and Slidell were closed from September 9 to September 15, 1965. Peaks of up to 15,183 vehicles daily were reached during this period on the Causeway. Severe traffic holdups developed on the facility during this emergency time. Two additional lanes would have eliminated the bottleneck.
On those five occasions when the Causeway was closed to traffic a total of 27 days because of rammings by tugs and barges, additional lanes would have maintained the facility in service. A combination of a hurricane or flooded condition and a serious tug-barge ramming without additional lanes will spell disaster for the transportation net work of the Greater New Orleans Area, cutting off, at (sic) it would, all vehicular transportation to and from the north area of Lake Pontchartrain.
Since 1963 the number of draw span openings to accomodate (sic) navigation in the lake has increased from 4,190 to 10,752 annually. Each time the spans are opened traffic must come to a halt. The proposed high level bridges will eliminate this tie-up.
Vehicular accidents on the Causeway have increased, particularly with respect to head-on collisions. This often fatal type accident will be eliminated by separate lanes.
The plan of improvements which has been introduced into evidence as part of the stipulations conclusively establishes that the added lanes will be a part of the existing facility, physically attached thereto, servicing the same traffic and utilizing the same approach roads. That it constitutes an improvement to the existing structure cannot seriously be doubted. The widening of a highway on the ground would universally be acknowledged as such. The fact that this widening takes place on water should make no difference.”
The authority for two or more parishes to jointly undertake construction of roadways and other improvements is contained in LSA-R.S. 33, Chapter 2, Part VII, entitled “Intergovernmental Functions” which contains, inter alia, the following provision:
“§ 1323. Liberal construction
This Part shall be construed liberally, to the end that, through the use of the arrangements provided herein, greater economy and efficiency in the operation of local services may be encouraged, and the benefits of such services may be extended.”
Notwithstanding such general authorization as is contained in the hereinabove referred to Intergovernmental Functions statute, the legislature deemed it advisable to confer upon the Parishes of Jefferson and St. Tammany constitutional authorization corroborative thereof and supplementary thereto. To accomplish this end, the legislature proposed, by Act 90 of 1952, an amendment to the state Constitution specifi *441 cally granting the Parishes of Jefferson and St. Tammany, authority to construct the Expressway which amendment, duly approved by the electorate, appears in Article VI, Section 22(g) (5), the confirmatory portion thereof reading as follows:
“The power and authority of the Parishes of Jefferson and St. Tammany to jointly construct the Expressway and to issue revenue bonds jointly for such purpose is hereby expressly confirmed.”
Since the proposed causeway was to be •constructed over state-owned submerged lands, the Amendment further provided:
“The Parishes of Jefferson and St. Tammany are hereby granted the right .and privilege to jointly construct, operate .and maintain the Expressway over, under, through and across any State owned lands, surfaced or submerged, necessary therefor; provided, that when the said revenue bonds of said Parishes shall have been fully paid in principal and interest, the Expressway shall become the property of the State of Louisiana, and shall thereafter be operated and maintained by the State Department of Highways as a toll-free project and as part of the State Pligh-way System.
The Expressway is hereby declared to he a part of the State Highway System, .and the State Department of Highways or its successor is authorized to enter into •contracts with the Parishes of Jefferson and St. Tammany for the operation and maintenance of the Expressway.”
In clear and unmistakable terms the foregoing provisions of the Amendment confirmed a right of way to the parishes involved over all state lands, submerged or otherwise, to be traversed by the proposed facility, subject to the proviso the Expressway would eventually become the property of the State. The granting of the mentioned right of way obviated the sale of the •state lands involved to the parishes concerned as might otherwise be contemplated pursuant to Article VI, Section 27 of the State Constitution.
Appellants argue that the foregoing and other applicable provisions of the pertinent Constitutional article must be considered together with the following clause contained therein:
“(5) Out of the existing monies in State Highway Fund No. 2, the State Treasurer shall set aside and advance to the Parishes of Jefferson and St. Tammany as needed, amounts up to an aggregate of Three Hundred Fifty Thousand Dollars ($350,000.00) to be used by said Parishes for the purpose of defraying costs of detailed engineering plans and specifications and the obtaining, gathering and compiling of all data necessary thereto and the costs thereof required for the construction of the toll bridge or causeway and requisite approaches across Lake Pontchartrain and connecting the Parishes of Jefferson and St. Tammany, which said Parishes have contracted in accordance with existing laws to jointly finance, construct, operate and maintain.”
On this premise learned counsel for appellants maintain the terms and provisions of the Amendment contemplate construction of a specific project which the Parishes of St. Tammany and Jefferson had previously contracted to finance, construct, operate and maintain consequently the only structure authorized to be built was that for which a specific contract had been let. Predicated on the same assumption, counsel argues there is no constitutional authorization for any structure except the one for which plans existed at the time of adoption of the amendment, and the proposed additions or improvements exceed the Commission’s authority. Counsel argues further that after providing for construction of the toll bridge or causeway specifically authorized the remaining provisions of the amendment relate to this “specific toll bridge” which was to be designed with funds initially allocated from Highway Fund No. 2; *442 it was this specific project for which revenue bonds were to be issued, and it was this specific project alone for which moneys from Highway Fund No. 2 could be pledged as additional security.
The clause relied upon by counsel for appellants as relating solely to a specific project for which plans existed at the time of passage of the amendment does not, and indeed could not relate to such a project for the simple reason no plans for a specific project had been drawn or adopted when the amendment was approved by the electorate. The clause relied upon by counsel for appellants could only relate to the contract wherein the collaborating governmental agencies agreed to undertake construction as an authorized governmental function since such was the only agreement reached or entered into by the parishes concerned as of that time. The Commission was not in existence as of the date of the “contract” referred to by counsel for appellants.- The record reveals the Commission was created subsequent to adoption of the Amendment, by resolution of the governing authorities concerned, in accord with the provisions of LSA-R.S. 33:1332, and thereafter the necessary bonds were issued and contracts let. Moreover, we note in paragraph 9 of the answer of intervenor-appellant, Malcolm B. Wright, III, the express averment that following passage of the amendment the expressway was designed, plans and specifications therefor drawn, revenue bonds were issued and construction contracts awarded.
We find nothing in the language of the Amendment to substantiate counsel’s contention a particular design or size of causeway or specific expressway was contemplated. Construction of additional lanes of travel to improve or update an existing highway is not generally considered construction of a new roadway and we have been cited no cogent reason for holding otherwise in the case of a bridge or causeway. This appears especially true when, as in the case at bar, the addition or improvement is designed in such manner as to physically connect with the existing structure in order to utilize the original approaches, permit an exchange of vehicular traffic between the initial and added traffic, lanes and allow a diversion of a substantial percentage of traffic from the original to-the added lanes of travel.
To hold otherwise would, we believe, result in an unreasonably strained interpretation of the amendment contrary to the concluding paragraph thereof which 'reads as follows:
“The purpose of this amendment is to-secure the development of the State of Louisiana by the construction of the Mississippi River crossing and the Expressways described herein and it shall' be liberally construed to effectuate such purpose.”
Furthermore, to hold as argued by counsel for appellants would negate the Commission’s authority pursuant to LSA-R.S.. 33:1324 which expressly states two or more parishes may contract for the making of any improvement which either may undertake pursuant to ANY PROVISION OF GENERAL OR SPECIAL LAW including,, inter alia, "(4) the construction, or maintenance and use of public improvements-such as roads, streets, sidewalks, buildings, BRIDGES, sewers and wharves.” (Emphasis added by the Court.) We detect nothing in the Amendment indicative of intent to reduce the authority of the parishes pursuant to LSA-33:1324 but rather a clear and unmistakable policy of implementation and supplementation thereof to facilitate and expedite construction of an expressway which will be adequate in all respects to meet the public need.
To hold as suggested by counsel for appellants would have the additional effect of depriving the Commission of its original authority to construct additions and improvements pursuant to LSA-R.S. 33:1324 so long as any revenue bonds issued by the Commission remained outstanding, because *443 of the following clause appearing in the ■amendment:
“So long as any of said revenue bonds issued by the Parishes of Jefferson and St. Tammany arc outstanding neither the State of Louisiana nor any municipality, parish, political subdivision or agency thereof nor any body under its control shall construct or permit the construction or operation of any vehicular bridge, causeway, tunnel or ferry across Lake Pontchartrain at any point within ten miles of the Expressway.”
The foregoing provision is obviously not 'subject to future amendment by the legislature or electorate so long as bonds previously issued remain outstanding because to do so would impair obligations under existing contracts. We believe it manifestly unreasonable to ascribe to the legislature and the electorate an intent to obviate the possibility of improving the existing structure even by Constitutional authorization notwithstanding the need to protect the traveling public against the hazards of rapidly accelerating traffic congestion.
We note that in Cooley v. Sewerage Dist. No. 1 of Town of Slidell, 172 La. 1019, 136 So. 37, it was expressly held that a constitutional provision authorizing issuance of bonds and incurrence of debt for construction of a sewerage system, embraced power and authority to issue bonds and incur debt to “improve” the system. Counsel for appellants seeks to distinguish the Cooley case, supra, from that at bar on the ground the instant matter involves construction of an entirely new and distinct major improvement, while the cited authority was concerned with mere improvement:» to an existing system. We observe that the Cooley case, supra, does not indicate the nature of the improvements involved therein and fails to reveal whether the improvements consisted of installing new lines and extensions or was limited to repair or maintenance of existing facilities, consequently we can only surmise what relationship a $40,000 “improvement” of the sewerage system of Slidell in 1931 bore to the cost of the whole system. Nevertheless, as we understand it, the decision of the Supreme Court is not based on the extent of the improvement except to note at length and in quite some detail a distinction between “improvement” and mere “maintenance.”
As stated by the Supreme Court in the Cooley case, supra, the word “improve” is less inclusive than the word “construct”, but more inclusive than the term “maintenance.” As we view the matter the authority to “construct” embraces power to “improve” which latter term includes extension, addition to, modification, modernization and updating a facility to make it reasonably adequate for its intended purpose when such extension, addition, modernization or updating becomes an integral part of the original structure and together therewith constitutes a unit capable of more efficient service to the public. We conclude, therefore, the additions and improvements contemplated by the defendant Commission do not amount to construction of a new causeway or bridge.
We do not find, as contended by counsel for appellants, that Trahan v. Police Jury of Jefferson Parish, 225 La. 920, 74 So.2d 164, is decisive of the issue presented herein. In the Trahan case, the Supreme Court observed that the Parishes of Jefferson and St. Tammany were authorized to jointly construct a causeway across Lake Pontchartrain connecting the two parishes, and issue joint revenue bonds to finance such undertaking. This does not mean, however, the Supreme Court expressed the opinion that such authority does not extend to the improvements presently contemplated. Our review of the decision in the Trahan case, supra, reveals no expression by the court regarding whether “construct” embraces the term “improve”, and were it called upon to do so, we have no reason to suppose the Supreme Court will reverse its prior holding in the Cooley case. While the following authorities are persuasive rather than controlling we note, in *444 passing, that in certain other jurisdictions authority to “construct” has been construed to include power to “improve”, namely, Thomason v. Court of County Com’rs, 184 Ala. 28, 63 So. 87; Anderson v. City of North Miami, Fla., 99 So.2d 861; Pasco County v. Johnson, Fla., 67 So.2d 639.
Regarding the Commission’s authority to refund outstanding bonds, three contentions are made on behalf of appellants, namely: (1) in the absence of specific authority to refund no such power will be implied excepting when no new debt is created and no increased indebtedness results; (2) assuming the power to refund exists, it does not include authorization to issue bonds for an additional indebtedness, and (3) granting the Commission’s power to refund any bonds issued for said purpose would no longer carry the support of the Highway Fund No. 2 dedication provided by the Amendment. In this regard we note that in Tonry v. Board of Levee Commissioners, 186 La. 159, 171 So. 836, and State ex rel. Porterie v. Board of Liquidation, 190 La. 520, 182 So. 661, the Supreme Court upheld the implied power to refund after being careful to point out that a different result might have been reached had it been shown the respective boards involved were attempting to increase the rate of interest, create a new debt or increase the old indebtedness. In the case at bar it has not been shown that refunding will result in a higher interest rate or an increase in the aggregate of bonds which must be issued to refund the total of those presently outstanding. The candidly expressed intent of the Commission in the present matter is to obtain more funds for the proposed additions. Any attack upon the bonds issued by the Commission to refund presently outstanding bonds, based on an increase in interest rate, is obviously premature at the present time and would remain so until such interest rate becomes known.
Appellants next argue that in matters regarding refunding of bonds and dedication of public funds a rule of strict construction applies. Granting this to he true as a general rule, the present case must be excepted from the principle because of the mandate contained in the Amendment requiring a liberal construction of its terms to effectuate its declared purpose.
With respect to the issuance of such additional bonds as may be required tO' defray the cost of the improvements proposed, we note that the amendment places-no limitation upon the amount of bonds-the Commission may issue and neither does-it restrict the time in which the maturity of bonds shall occur. There is, of course,, no express qualification that the Commission is authorized to issue only such bonds-as may be required to construct an initial facility. In view of the stated purposes of the amendment, its self-contained mandate of liberal construction and the implied authority therein conferred upon the Commission to improve the Causeway, we can only conclude the legislature and electorate intended to grant the correlative right to issue such bonds as might be necessary to defray the cost of improvements and additions which seek to make the expressway-more efficient and better adapted to discharge its function. The rule that the legislature and electorate extended the power to improve, add to or extend without conferring the necessary authority to finance is tantamount to holding that on one hand' a right, power or duty was conferred while on the other hand, it was simultaneously-taken away. Such a conclusion results in a patent inconsistency which totally nullifies-the right granted. We do not believe the legislature and electorate intended such an-anomalous situation to occur. We hold, therefore, the Amendment confers upon the-Commission authority to issue such additional revenue bonds as may be required to-finance the cost of the improvements contemplated which bonds, if sold in accordance with the terms and provisions of the Amendment, shall have the full support of the pledge of Highway Fund No. 2 funds provided for in the Amendment.
*445 Intervenor-appellant, Malcolm B. Wright, III has raised a constitutional issue predicated upon the due process clause of the United States Constitution. In this regard it is contended Highway Fund No. 2 depends upon revenues derived from six parishes (Orleans, Jefferson, St. John the Baptist, St. Charles, Tangipahoa, and St. Tammany) and to permit the governing authorities of only two of the parishes (Jefferson and St. Tammany) to extend the dedication of the funds to additional revenue bond issues, is arbitrary and unreasonable and constitutes a taking of property without due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Intervenor further argues that where the tax imposed clearly results in such a flagrant and palpable inequality between the burden imposed and the benefit received that it amounts to an arbitrary taking of property without compensation, the tax violates the due process clause. In support of this contention he cites Morton Salt Co. v. City of South Hutchinson, 10 Cir., 159 F.2d 897, and Dane v. Jackson, 256 U.S. 588, 41 S.Ct. 566, 65 L.Ed. 1107.
Appellee counters that an inter-venor cannot enlarge the issues by raising a federal question. Rubion Transfer & S. Co. v. Louisiana Public Service Commission, 240 La. 440, 123 So.2d 880. Assuming, for sake of argument, the issue is properly raised, we note that Highway Fund No. 2 is not composed of parish taxes. It is comprised of certain state taxes collected in the six-parish area. The Legislature and the people of the State by constitutional amendment have dedicated portions of this fund to the Greater New Orleans Expressway Commission. Other dedications of the fund are made for use in other public works in other parishes within the six-parish area. The State of Louisiana is free to spend state revenues in any part of the state where they are deemed beneficial. The fact that a portion of state revenues collected in the parishes surrounding Lake Pontchartrain have been dedicated for public works in various projects within that area does not warrant a conclusion that there is an inequality between the burden imposed and the benefits received. The improvement of the state highway system benefits the people of the entire state by facilitating travel, communications and commerce and by encouraging industrial and economic development, which in turn will produce a greater per capita income, a larger gross economic product, and greater revenues for the state. It is the expressed purpose of the Constitutional Amendment to secure the development of the State of Louisiana. We find no merit in this argument
For the foregoing reasons, the judgment of the district court is affirmed.
Affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.